**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

| | |
|---|---|
| UNIVERSAL LIFE CHURCH MONASTERY STOREHOUSE; REV. JAYLEN N. SHORTS, an individual; and REV. MICHAEL E. DAVIS, an individual, <br><br>                       Plaintiffs, <br><br>     v. <br><br> R. STEVEN LANDES, in his official capacity as Clerk of Circuit Court for Augusta County; TIM A. MARTIN, in his official capacity as Commonwealth's Attorney for Augusta County; STACI N. FALLS, in her official capacity as Clerk of Circuit Court for the City of Staunton; and JEFFREY GAINES, in his official capacity as Commonwealth's Attorney for the City of Staunton, <br><br>                       Defendants. | Civil Action No. 5:25-cv-00047-JHY-JCH <br><br> **PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' RULE 12(b)(1) AND 12(b)(6) MOTIONS TO DISMISS** <br><br> **[ORAL ARGUMENT REQUESTED]** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. FACTUAL ALLEGATIONS .................................................................................2

    A. ULC Monastery's Ministry and Outreach ................................................2

    B. Virginia Marriage Ordination Law ..........................................................2

    C. Defendant Landes Discriminates Against Rev. Shorts and the Church..................3

    D. The Clerk Defendants Discriminate Against Rev. Davis and the Church ..............5

III. LEGAL STANDARD............................................................................................5

IV. ARGUMENT ........................................................................................................6

    A. Plaintiffs' Claims Are Justiciable .............................................................6

        1. Plaintiffs have standing to bring their claims. .............................6

            a. Plaintiffs have alleged cognizable injuries in fact. ........................7

            b. An injunction would redress Plaintiffs' injuries. ...........................11

        2. The Church has standing to challenge the Prosecuting Defendants' enforcement of § 20-28..................................................................11

        3. Plaintiffs' claims against Defendant Falls are constitutionally ripe, and not speculative...................................................................13

        4. The Prosecuting Defendants have failed to establish that they are entitled to sovereign immunity. ..................................................14

    B. The Complaint States Claims for Relief ................................................15

        1. The Complaint states an Establishment Clause claim. ..............15

        2. The Complaint states a Free Exercise Clause claim. ................18

        3. The Complaint states an Equal Protection Clause claim. ..........21

            a. The refusal to recognize ULC ministers discriminates on the basis of religion.......................................................................21

b.     The refusal to recognize ULC Ministers infringes on the fundamental right to practice one's religion without government interference. ................................................................23

4.     The Complaint states a Free Speech claim. ................................................23

5.     Plaintiffs allege Defendants' failure to satisfy strict scrutiny. ...................26

V.     CONCLUSION ....................................................................................................28

**Page(s)**

**Federal Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023).................................................................................................25

*Adams v. Bain*,
    697 F.2d 1213 (4th Cir. 1982) ...............................................................................6

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)..........................................................................................22, 24

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*,
    1 F.4th 180 (4th Cir. 2021) ...................................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................5

*Ayotte v. Planned Parenthood of N. New England*,
    546 U.S. 320 (2006)................................................................................................11

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)............................................................................................9, 10

*Bates v. Pakseresht*,
    --- F.4th ----, 2025 WL 2079875 (9th Cir. July 24, 2025) ....................................19

*Bell v. Presbyterian Church*,
    126 F.3d 328 (4th Cir. 1997) ................................................................................18

*Bostic v. Schaefer*,
    760 F.3d 352 (4th Cir. 2014) ........................................................................7, 8, 12

*Bowman v. United States*,
    564 F.3d 765 (6th Cir. 2008) ................................................................................23

*Brown v. District of Columbia*,
    390 F. Supp. 3d 114 (D.D.C. 2019).................................................................26, 27

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)..........................................................................................27, 28

*Bryant v. Woodall*,
    1 F.4th 280 (4th Cir. 2021) .....................................................................................9

*Carolina Youth Action Project v. Wilson*,
  60 F.4th 770 (4th Cir. 2023) ...................................................................7

*Cath. Charities Bur., Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*,
  605 U.S. 238 (2025) ........................................................................ *passim*

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) .................................................................................19

*City of Austin v. Paxton*,
  943 F.3d 993 (5th Cir. 2019) .................................................................14

*City of Dallas v. Stanglin*,
  490 U.S. 19 (1989) ...................................................................................24

*City of Los Angeles v. Preferred Commc'ns, Inc.*,
  476 U.S. 488 (1986) ...................................................................................6

*Cooksey v. Futrell*,
  721 F.3d 226 (4th Cir. 2013) ...................................................................7

*Cornelio v. Connecticut*,
  32 F.4th 160 (2d Cir. 2022) .....................................................................6

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
  483 U.S. 327 (1987) ...........................................................................21, 22

*Ctr. for Inquiry, Inc. v. Warren*,
  2019 WL 3859310 (N.D. Tex. Aug. 16, 2019), *vacated on other grounds*,
  845 F. App'x 325 (5th Cir. 2021) ...........................................................8

*Daniels v. Arcade, L.P.*,
  477 F. App'x 125 (4th Cir. 2012) .........................................................10

*Doe v. Duling*,
  782 F.2d 1202 (4th Cir. 1986) .........................................................10, 11

*Doe v. Virginia Department of State Police*,
  713 F.3d 745 (4th Cir. 2013) .................................................................13

*Does 1–5 v. Cooper*,
  40 F. Supp. 3d 657 (M.D.N.C. 2014) ...................................................10

*Edgar v. Haines*,
  2 F.4th 298 (4th Cir. 2021) .......................................................................7

*Educ. Media Co. at Va. Tech, Inc. v. Insley*,
  731 F.3d 291 (4th Cir. 2013) ...................................................................6

iv

*Elrod v. Burns*,
    427 U.S. 347 (1976)........................................................................8

*EQT Production Co. v. Wender*,
    870 F.3d 322 (4th Cir. 2017) ........................................................9

*Espinoza v. Mont. Dep't of Revenue*,
    591 U.S. 464 (2020)......................................................................18

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*,
    166 F.3d 642 (4th Cir. 1999) ........................................................6

*Fauconier v. Clarke*,
    966 F.3d 265 (4th Cir. 2020) ..................................................21, 22

*Foulke v. Virginia State Police*,
    2012 WL 4356692 (W.D. Va. Sept. 24, 2012) ............................15

*Fowler v. Rhode Island*,
    345 U.S. 67 (1953)........................................................................20

*Free Speech Coal., Inc. v. Paxton*,
    145 S. Ct. 2291 (2025)..................................................................27

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)......................................................................19

*Glob. Impact Ministries, Inc. v. City of Greensboro*,
    2022 WL 801714 (M.D.N.C. Mar. 16, 2022) ................................7

*Healthy Vision Ass'n v. Abbott*,
    138 F.4th 385 (5th Cir. 2025) ......................................................15

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012)......................................................................17

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*,
    515 U.S. 557 (1995)......................................................................24

*Idaho v. Coeur d'Alene Tribe of Idaho*,
    521 U.S. 261 (1997)......................................................................14

*Johnson v. Robison*,
    415 U.S. 361 (1974)......................................................................23

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) ....................................................8, 24

*Kedroff v. St. Nicholas Cathedral*,
    344 U.S. 94 (1952) ........................................................................17, 20

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022) ...............................................................................16

*Kerns v. United States*,
    585 F.3d 187 (4th Cir. 2009) ..................................................................6

*Larson v. Valente*,
    456 U.S. 228 (1982) ....................................................................15, 21, 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................10

*Mahmoud v. Taylor*,
    145 S. Ct. 2332 (2025) ...........................................................................27

*Majors v. Abell*,
    317 F.3d 719 (7th Cir. 2003) ..................................................................9

*Martin v. Walton*,
    368 U.S. 25 (1961) .................................................................................22

*Maryland Shall Issue, Inc. v. Hogan*,
    971 F.3d 199 (4th Cir. 2020) ................................................................10

*Masterpiece Cakeshop v. Colorado Civ. Rts. Comm'n*,
    584 U.S. 617 (2018) ...............................................................................20

*McDaniel v. Paty*,
    435 U.S. 618 (1978) ...............................................................................20

*Md. Highways Contractors Ass'n, Inc. v. Maryland*,
    933 F.2d 1246 (4th Cir. 1991) ............................................................7, 12

*Menders v. Loudoun Cnty. Sch. Bd.*,
    65 F.4th 157 (4th Cir. 2023) .................................................................10

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...............................................................................25

*Moss v. Spartanburg Cnty. Sch. Dist. Seven*,
    683 F.3d 599 (4th Cir. 2012) ..................................................................7

*N.C. Right to Life, Inc. v. Bartlett*,
    168 F.3d 705 (4th Cir. 1999) ..............................................................9, 10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020)................................................................................17

*Perry v. Sindermann*,
    408 U.S. 593 (1972)............................................................................20, 24

*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*,
    767 F. Supp. 3d 293 (D. Md. 2025)......................................................12

*Preston v. Leake*,
    660 F.3d 726 (4th Cir. 2011) ...............................................................9, 12

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)............................................................................23, 26

*Republican Party of N.C. v. Martin*,
    980 F.2d 943 (4th Cir. 1992) ...............................................................6, 26

*RHI, Inc. v. Prince George's County*,
    584 F. Supp. 2d 766 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010) ........................21

*Roller v. Gunn*,
    107 F.3d 227 (4th Cir. 1997) .................................................................21

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)..................................................................................8

*Romer v. Evans*,
    517 U.S. 620 (1996)...............................................................................27

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)...............................................................................25

*Rothamel v. Fluvanna County*,
    810 F. Supp. 2d 771 (W.D. Va. 2011) ....................................................9

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006).................................................................................24

*Se. Booksellers Ass'n v. McMaster*,
    282 F. Supp. 2d 389 (D.S.C. 2003)........................................................10

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975)...............................................................................24

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976)............................................................................17, 20

*Smith v. District of Columbia*,
    387 F. Supp. 3d 8 (D.D.C. 2019) ........................................................26

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ........................................................................25

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..................................................................13, 14

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ..........................................................................28

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,
    450 U.S. 707 (1981) ........................................................................20

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ........................................................................26

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ........................................................................25

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025) ....................................................................21

*Universal Life Church Monastery Storehouse v. McGeever*,
    2022 WL 2040002 (W.D. Pa. June 6, 2022) .......................................2

*Universal Life Church Monastery Storehouse v. McGeever*,
    2022 WL 214238 (W.D. Pa. Jan. 25, 2022) ..............................1, 8, 13

*Universal Life Church Monastery Storehouse v. Nabors*,
    35 F.4th 1021 (6th Cir. 2022) .......................................................1, 10

*Va. Soc'y for Hum. Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ...........................................................9

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002) ........................................................................14

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ........................................................................24

*Washington v. Davis*,
    426 U.S. 229 (1976) ........................................................................22

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
    252 F.3d 316 (4th Cir. 2001) .........................................................15

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872) ........................................17

*White Tail Park, Inc. v. Stroube*,
  413 F.3d 451 (4th Cir. 2005) ........................................12

*Wikimedia Found. v. NSA*,
  857 F.3d 193 (4th Cir. 2017) ........................................7

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)........................................19

*Ex parte Young*,
  209 U.S. 123 (1908)........................................14, 15

**State Cases**

*Application of Ginsburg*,
  236 Va. 165 (1988) ........................................22

*Cramer v. Commonwealth*,
  214 Va. 561 (1974) ........................................11, 18

*In re Dhanoa*,
  86 Va. Cir. 373, 2013 WL 8019586 (Va. Cir. Ct. Mar. 29, 2013)........................................3

**Constitutional Provisions**

U.S. Const.,
  amend. I........................................ *passim*
  amend. XI........................................14
  amend. XIV ........................................ *passim*

**Federal Statutes**

42 U.S.C. § 1983........................................26

**State Statutes**

Virginia Code
  § 20-23 ........................................ *passim*
  § 20-25 ........................................ *passim*
  § 20-26 ........................................ *passim*
  § 20-28 ........................................ *passim*
  § 57-1 ........................................17

**Rules**

Federal Rule of Civil Procedure
    12(b)(1) ..........................................................................................................6
    12(b)(6) ...............................................................................................5, 6, 15

**Other Authorities**

Arlin M. Adams & Charles J. Emmerich, *A Heritage of Religious Liberty*,
    137 U. Pa. L. Rev. 1559, 1574 (1989) ....................................................17

Thomas Jefferson, *Autobiography* (1821), reprinted in *The Life and Selected Writings of*
    *Thomas Jefferson* 46 (A. Koch & W. Peden eds., 2004) .........................17

# I.    INTRODUCTION

This case concerns open, invidious, and undisputed denominational discrimination. Although Augusta County and City of Staunton officials authorize ordained ministers of *other* religious orders to solemnize marriages pursuant to Virginia law, they—like the majority of Circuit Court Clerks in the Commonwealth of Virginia—deny the same privileges to Plaintiff Universal Life Church Monastery Storehouse ("ULC" or "the Church") based solely on the way the Church ordains its ministers.

That discriminatory application of Virginia law violates the Church and its ministers' fundamental constitutional rights. Days after Plaintiffs filed this case, a unanimous Supreme Court reaffirmed that "the government may not 'officially prefer' one religious denomination over another" by granting a privilege that "differentiates among religions based on theological choices," "practices," or "the content of different religious doctrines." *Cath. Charities Bur., Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247–52 (2025). Just as Wisconsin officials could not deny a tax exemption to a Catholic charity whose theological practices precluded it from meeting the government's criteria for having "religious purposes," *id.* at 249, Virginia officials cannot deny Church ministers the privilege of solemnizing weddings just because the Church's ordination practices are deliberately "less ritualistic, more unorthodox, and less formal" than other religions' practices, or what these officials believe Virginia law requires. *Id.* at 248 (quotation omitted).

None of this is novel. When Tennessee officials denied Church ministers equal rights to solemnize weddings, the Sixth Circuit rejected their standing and sovereign immunity defenses, *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022), resulting in consent decrees preventing future discrimination. And when Pennsylvania county officials discriminated against Church ministers, a federal court denied their motions to dismiss on similar grounds, *Universal Life Church Monastery Storehouse v. McGeever*, 2022 WL 214238 (W.D. Pa. Jan. 25, 2022), later entering a consent judgment stating that it "would violate the First and Fourteenth Amendments to the United States Constitution" to deny Church ministers "legal

authority to solemnize marriages" on equal terms as other denominations. *Universal Life Church Monastery Storehouse v. McGeever*, 2022 WL 2040002, at *1 (W.D. Pa. June 6, 2022).

The motions here should be denied for the same reasons. Plaintiffs' claims are justiciable, and the Complaint sufficiently alleges violations of the First and Fourteenth Amendments.

## II.     FACTUAL ALLEGATIONS

### A.     ULC Monastery's Ministry and Outreach

ULC Monastery is a non-denominational church that champions religious freedom, social justice, and diverse forms of spiritual expression. Dkt. 1 (Compl.) ¶ 2. Its two core tenets are that (1) individuals should always strive to do that which is right, and (2) all people are naturally endowed with the right to practice their beliefs in the manner of their choosing, so long as that expression is lawful and does not infringe on the rights of others. *Id.* ¶ 18.

The Church embraces the principle that all those who feel called to serve can become ministers. *Id.* ¶ 20. Central to its theology is the conviction that the call to ministry comes from within—not from spiritual gatekeepers like an institutionalized church. *Id.* ¶¶ 20, 23-24 (citing Report of Dr. J. Gordon Melton, *Universal Life Church Monastery Storehouse v. Nabors*, No. 2:19-cv-00049, ECF No. 298-1 at ¶¶ 6-10 (M.D. Tenn. filed June 28, 2023)). To that end, the Church deliberately ordains ministers at no cost through an online process and provides formal credentials, spiritual texts, and pastoral guidance by mail. *Id.* Anyone who accepts the Church's core tenets is welcome to affiliate with the Church, and anyone who affiliates with the Church may become a minister. *Id.* Many ULC ministers—including Plaintiffs Rev. Jaylen Shorts and Rev. Michael Davis—serve by solemnizing marriages. *Id.* ¶¶ 2, 22.

### B.     Virginia Marriage Ordination Law

Virginia law establishes three distinct pathways for individuals who are not public officials to solemnize marriages. Two are available to ministers ordained by or affiliated with a religious organization. *Id.* ¶¶ 29–30; Va. Code §§ 20-23, 20-26. The third is more burdensome, and available to lay individuals. Compl. ¶ 31; Va. Code § 20-25. Compliance with these provisions is enforceable by criminal penalties. Compl. ¶ 36; Va. Code § 20-28.

*Ordained ministers.* Virginia Code § 20-23 provides that ordained ministers in regular communion with "any religious denomination" may solemnize marriages upon proof of their ordination and regular ministry. Compl. ¶ 29.

*Societies with no minister.* For persons who belong to a religious society without a minister—or for religious societies in which all members are equally able to minister the rites and customs of the religion—Virginia Code § 20-26 provides that any person from that society may be designated as an officiant. Compl. ¶ 30. Although this provision formally requires posting of a $500 bond, a Virginia Circuit Court held that this provision's "bond requirement is clearly unconstitutional" as it unlawfully "favor[s] one type of religion over another" based on the way a religion ordains ministers. *In re Dhanoa*, 86 Va. Cir. 373, 2013 WL 8019586, at *5 (Va. Cir. Ct. Mar. 29, 2013). Ministers from denominations governed by Virginia Code § 20-26 are thus "authorized to perform marriage ceremonies without" posting a bond. *Id.*

*Lay persons.* Persons without a recognized religious ordination, affiliation, or qualifying government office may petition for civil celebrant authority and pay associated filing fees to perform marriages under Virginia § 20-25, provided they post a $500 bond and obtain a judicial order. Compl. ¶ 31.

*Enforcement.* Under Virginia Code § 20-28, it is a crime to solemnize a wedding as a religious minister without official authorization. Compl. ¶ 36. Defendants Martin and Gaines (the "Prosecuting Defendants") have authority and an obligation to enforce this prohibition in Augusta County and the City of Staunton respectively. *Id.*

Clerks in Augusta County and the City of Staunton directed by Defendants Landes and Falls (the "Clerk Defendants") regularly deny ministerial recognition under § 20-23 and § 20-26 to ULC-ordained ministers solely because they were ordained by the Church and not by some other, state-preferred denomination. Compl. ¶¶ 35, 42–43.

### C.    Defendant Landes Discriminates Against Rev. Shorts and the Church

Rev. Jaylen Shorts is a Church minister whose ordination reflects a sincere and personal religious calling to serve her community—especially those who may feel uncomfortable or

excluded in traditional religious environments. Compl. ¶ 38. Rev. Shorts discovered the Church around the same time her mother was planning to remarry and asked her to officiate the ceremony. *Id.* ¶ 39. Seeking a path to meaningful ordination, Rev. Shorts reviewed the tenets of ULC Monastery and found that its inclusive, non-denominational approach aligned with her moral and spiritual beliefs. *Id.* She was especially drawn to the Church's affirmation of spiritual autonomy and its embrace of LGBTQ individuals and others outside traditional faith structures. *Id.*

In November 2024, Rev. Shorts completed ULC's online ordination process and received formal credentials, including a certificate of ordination and guidance on officiating religious rites. *Id.* ¶ 40. While officiating her mother's wedding was the immediate goal, Rev. Shorts also saw ordination as the beginning of a broader religious ministry rooted in her personal faith. *Id.* ¶ 39–40. She began preparing to officiate her mother's January 2025 ceremony and made herself available as a spiritual counselor and minister in her community. *Id.* ¶ 40.

Her ministry, however, was quickly thwarted. When she and her mother contacted the Augusta County Circuit Court Clerk's Office on December 27, 2024, Defendant Landes's staff refused to recognize her ordination. The Clerk's Office provided an **"IMPORTANT"** warning letter stating that it **"does not recognize anyone affiliated with the 'Universal Life Church' or any other online ordination certifications, as being authorized to perform marriages."** *Id.* ¶ 41 (emphasis added). Defendant Landes's office gave Rev. Shorts two options: (i) post a $500 bond and petition for a one-time civil authorization under Virginia Code § 20-25, or (ii) substitute another religious officiant from a government-approved preferred list. *Id.* ¶ 42.

Rev. Shorts declined to pursue the one-time civil authorization available under Virginia law. Not only did the $500 bond pose a non-trivial financial burden, but more fundamentally, she was unwilling to seek secular approval for what she understood to be a sacred religious act. *Id.* ¶ 45. The family reluctantly selected an officiant from the government-approved list. *Id.* ¶ 46. Rev. Shorts was distraught. The ceremony had been a chance not just to honor her mother, but to practice her ministry. *Id.* Instead, Rev. Shorts was forced to watch a disinterested stranger officiate in her place. With the weather turning chilly, the government-backed officiant chose to remain in

her car during the ceremony, pronouncing the couple husband and wife through the window while reading from a script. It was far from the intimate and spiritually meaningful ceremony Rev. Shorts and her mother had envisioned. *Id.* ¶ 47. Rev. Shorts nevertheless stands ready and willing to officiate weddings in her capacity as a minister, and would do so if allowed. *Id.* ¶¶ 48-52.

### D. The Clerk Defendants Discriminate Against Rev. Davis and the Church

Rev. Michael Davis is an ordained Church minister for whom ministry is a sacred religious vocation. *Id.* ¶ 54. Raised in a deeply religious family, Rev. Davis's faith has guided him since childhood, and he views his ordination as part of a lifelong commitment to ministry. *Id.* When he discovered the ULC Monastery in 2024, its message of inclusivity and spiritual equality resonated with his beliefs. *Id.* ¶ 56. He completed the Church's ordination process in September 2024. *Id.*

In fall 2024, Rev. Davis's son asked him to officiate his wedding, then scheduled for June 2025 in Augusta County. *Id.* ¶ 58. Rev. Davis viewed this request as a sacred affirmation of his role as both a parent and a minister and promptly sought authorization under Virginia Code § 20-23. But both Defendant Landes, the Augusta County Circuit Court Clerk, and the Staunton Circuit Clerk's Office, headed by Defendant Falls, refused to recognize his ordination through the Church. *Id.* ¶ 59. Each told him that ULC ministers are categorically ineligible to perform marriages as religious officiants and instead offered only the option of seeking one-time civil authorization under § 20-25. *Id.*

Rev. Davis's son postponed his wedding until September 2025, still hopeful his father will be able to officiate. *Id.* ¶ 61. Rev. Davis was also forced to decline a request to officiate a June 2025 wedding for a coworker's family member. *Id.* ¶ 62. The resulting exclusion has left him feeling stifled, demoralized, and inferior. *Id.* Davis is ready and willing to officiate weddings in his capacity as a Church minister, but the Clerk Defendants' discriminatory enforcement of Virginia law prevents him. *Id.* ¶ 65.

### III. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss must be denied where a plaintiff alleges facts, accepted as true, to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because

such a motion only tests the legal sufficiency of a complaint, "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). As-applied constitutional challenges are poor candidates for Rule 12(b)(6) motions because they rest upon fact-bound determinations, *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013), including whether the government's asserted justifications satisfy the tailoring required by constitutional scrutiny. *See City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 495 (1986). Dismissal is thus "rarely, if ever" "appropriate at the pleading stage" of constitutional challenges, especially under the First Amendment. *Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022).

A Rule 12(b)(1) motion to dismiss may be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted). "[F]acts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Attacks on the factual predicate of subject matter jurisdiction are soluble only "*in an evidentiary hearing* [to] determine if there are facts to support the jurisdictional allegations." *Id.* A motion under Rule 12(b)(1) must thus be denied when, in a constitutional challenge, "jurisdictional facts are intertwined with the facts central to the merits of the dispute" and "the entire factual dispute is appropriately resolved only by a proceeding on the merits." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

## IV.    ARGUMENT

### A.    Plaintiffs' Claims Are Justiciable

The Defendants' threshold arguments are without merit. Plaintiffs have standing to bring their claims, those claims are ripe, and the Prosecuting Defendants are not entitled to immunity.

#### 1.    Plaintiffs have standing to bring their claims.

To establish Article III standing, a plaintiff must allege (1) an injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) a likelihood that a favorable

ruling will redress the injury. *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021). The same standard applies to an organization suing to vindicate its own rights. *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991). Only one plaintiff must have standing for the suit to proceed. *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023). Critically, these requirements are "relaxed" in First Amendment cases, and "tilt dramatically toward a finding of standing." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013).

Defendants do not dispute Plaintiffs have alleged traceability. Plaintiffs have also adequately alleged injury in fact and redressability.

### a. Plaintiffs have alleged cognizable injuries in fact.

"The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury in fact." *Wikimedia Found. v. NSA*, 857 F.3d 193, 212 (4th Cir. 2017) (citation omitted). That injury may take different forms depending on the right at stake. Here, each of Plaintiffs' constitutional claims alleges a distinct and legally cognizable harm.

***Establishment Clause.*** Defendants' refusal to recognize Plaintiffs' ordination has left Plaintiffs feeling marginalized and second-class. Compl. ¶ 46 (Rev. Shorts); ¶ 62 (Rev. Davis). The denial also harms the Church, "damaging its reputation and undercutting its religious mission," *id.* ¶¶ 51, 64, to make practicable ministry available to all who are called to serve in accordance with its values. *Id.* ¶¶ 20–24. "[S]tigmatic injuries" like these satisfy Article III's injury-in-fact requirement. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014). As the Fourth Circuit has explained, "[f]eelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion 'that they are *outsiders*, not full members of the political community.'" *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) (citation omitted); *see also Glob. Impact Ministries, Inc. v. City of Greensboro*, 2022 WL 801714, at *5 (M.D.N.C. Mar. 16, 2022) (religious group had standing to challenge law singling it out).

***Free Exercise Clause.*** Officiating marriage ceremonies is a core religious practice for many of the Church's ministers, including Rev. Shorts and Rev. Davis. Compl. ¶¶ 20–24, 50–51, 64, 58, 77. By refusing to recognize the Church's authority to perform those rites on equal terms as other denominations, Defendants burden the Church and its ministers' religious exercise. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020) (restrictions on religious exercise "strike at the very heart of the First Amendment's guarantee of religious liberty").

***Equal Protection Clause.*** "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," the "denial of equal treatment" is an actionable "injury in fact." *Bostic*, 760 F.3d at 371–72 (citation omitted). Defendants' application of Virginia law to deny Church ministers the authority to officiate weddings on equal terms as other religious ministers, solely because they were ordained by the Church, treats the Church and its ministers unequally and denies them a benefit available to other religious organizations and ministers. Compl. ¶¶ 4, 37, 44, 61, 64, 85. That is constitutional injury. *See also, e.g.*, *Ctr. for Inquiry, Inc. v. Warren*, 2019 WL 3859310, at *5 (N.D. Tex. Aug. 16, 2019) (religious group had standing to challenge discriminatory application of state marriage laws because when "similar parties" are treated "unequally," "no further showing of suffering based on that unequal positioning is required"), *vacated on other grounds*, 845 F. App'x 325, 329 (5th Cir. 2021) (failure to add necessary parties).

***Free Speech Clause.*** The performance of marriage rites is an expressive act that communicates the Church's and its ministers' values. *Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012). The Clerk Defendants' admonitions (Compl. ¶¶ 41, 43–44) that Church ministers, including Plaintiffs, "could not solemnize marriage ceremonies" has "chill[ed] their First Amendment rights," *McGeever*, 2022 WL 214238, at *3, generating actionable and "unquestionably" "irreparable" constitutional injuries. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

None of the Defendants' contentions defeats these well-pled allegations.

The Prosecuting Defendants principally argue Plaintiffs have suffered no actionable injury to enjoin their enforcement of § 20-28 because they have "*never* prosecuted or threatened to

prosecute *anyone* under … § 20-28," and "do not have any obligation" to do so. Dkt. 31 at 10–11. But the law only requires a plaintiff to demonstrate a "credible threat of prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). A law that facially restricts "activity by the class to which the plaintiff belongs" presents a credible threat of prosecution by itself, especially "when the presence of a statute tends to chill the exercise of First Amendment rights." *Preston v. Leake*, 660 F.3d 726, 735–36 (4th Cir. 2011) (citations omitted). Here, Virginia Code § 20-28 undisputedly makes it a crime for Church ministers to solemnize a marriage without state authorization. Its existence is sufficient to establish Plaintiffs' standing to challenge its unconstitutional application. *See N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (plaintiff had standing to challenge a campaign finance statute that, on its face, applied to its planned voter-education activities); *e.g.*, *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (Posner, J.) ("threat is latent in the existence of the statute"); *Rothamel v. Fluvanna County*, 810 F. Supp. 2d 771, 778 (W.D. Va. 2011) (prosecution "need not be explicitly threatened").

Even if the Prosecuting Defendants had *disavowed* enforcement—and they have not, *cf.* Dkts. 31-1 & 31-2 (prosecutors' affidavits)—it would make no difference. *See Bartlett*, 168 F.3d at 711 (standing existed despite "promise" plaintiffs "will face no criminal penalties" for undertaking conduct at issue). Following *Bartlett*, the Fourth Circuit has repeatedly held that "non-binding statements" that an official will not enforce a challenged statute "cannot override the plain text of the statutes when it comes to establishing a credible threat of enforcement." *Bryant v. Woodall*, 1 F.4th 280, 288–89 (4th Cir. 2021) (citation omitted) (rejecting district attorneys' statements that they planned "not to enforce" an abortion ban); *see also, e.g.*, *EQT Production Co. v. Wender*, 870 F.3d 322, 331 (4th Cir. 2017) (rejecting stipulation that county did "not intend" to enforce ordinance); *Va. Soc'y for Hum. Life, Inc. v. FEC*, 263 F.3d 379, 388 (4th Cir. 2001) (rejecting even "more formal" "policy of nonenforcement" "adopted by the FEC"). Without a court-ordered "guarantee," a plaintiff is forced to carry on at the mercy of the current officeholder,

and "will suffer from the reasonable fear that it can and will be prosecuted" at any moment. *Bartlett*, 168 F.3d at 711.[1]

Nor do Plaintiffs have to risk prosecution for solemnizing marriages (Dkt. 31 at 13) to establish standing, as "one does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt*, 442 U.S. at 298 (citation omitted); *Does 1–5 v. Cooper*, 40 F. Supp. 3d 657, 671 (M.D.N.C. 2014) (plaintiff does not lose standing by not doing what he claims a right to do). As in *Nabors*, 35 F.4th at 1034, where the Sixth Circuit rejected the same arguments against the Church and its ministers, it is enough that Plaintiffs are ready and willing (Compl. ¶¶ 48–49, 52 , 58, 61–63, 65) to engage in such activities, and would "do so but for [a] fear" of prosecution, *Bartlett*, 168 F.3d at 710 (standing exists in such circumstances); *see also Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 164 (4th Cir. 2023) (self-censorship is actionable injury).

Finally, the demand for more "particularized facts" (Dkt. 31 at 12, 13) about the wedding plans of couples Plaintiffs have been forced to turn away also fails. At the outset, Plaintiffs' injuries are not limited to turning away *those* weddings (Compl. ¶¶ 48, 58–62) but also include their inability to hold themselves out as available to perform religious marriage rites generally. *Id.* ¶¶ 50–52, 65. In any event, Plaintiffs' "general factual allegations," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), about Rev. Shorts' friends, customers, and co-workers (Compl. ¶ 48), and Rev. Davis's co-worker's family member (*id.* ¶ 62), are sufficient at the pleading stage. *Cf. Daniels v. Arcade, L.P.*, 477 F. App'x 125, 130 (4th Cir. 2012) (plaintiff need not allege "exact dates" or "specific time" of planned future event to establish standing); *see also Se. Booksellers Ass'n v. McMaster*, 282 F. Supp. 2d 389, 393 n.2 (D.S.C. 2003). Nothing in *Doe v. Duling*, 782 F.2d 1202

---

[1] The Prosecuting Defendants' citation to *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020) (Dkt. 31 at 9, 11) does not help. Maryland there not only disclaimed intent to prosecute—which, again, is not even the case here—but the dispositive factor was the absence of any allegation or evidence that the plaintiffs had "intention of engaging" in proscribed conduct. *Id.* at 218. There is nothing comparable here, where Plaintiffs *did* seek to perform weddings as religious officiants, and *would again* but for the Clerk Defendants' rejections under § 20-23 and 20-26, and the risk of prosecution under § 20-28. *See* Compl. ¶¶ 48–49, 52 , 58, 61–63, 65.

(4th Cir. 1986), suggests otherwise. Indeed, the Fourth Circuit in *Duling* expressly distinguished its analysis from "cases involving core First Amendment rights." *Id.* at 1206.

### b. An injunction would redress Plaintiffs' injuries.

The Clerk Defendants contend that Plaintiffs' injuries traceable to their offices are not redressable because the Virginia Supreme Court interpreted § 20-23 to deny Church ministers authorization in *Cramer v. Commonwealth*, 214 Va. 561 (1974), which the clerks argue they are obligated to enforce. Dkt. 29 at 7. But the Clerk Defendants' decision to enforce *Cramer*'s interpretation is the problem, as this lawsuit *challenges the constitutionality* of doing just that. *See* Compl., Prayer ¶¶ 99(a)–(b). It is emphatically within the power of the federal courts to declare discrete applications of a state statute unconstitutional and issue "carefully crafted injunctive relief" that prevents enforcement that "would present a constitutional problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 331 (2006).

The Clerk Defendants' argument that "[f]ederal courts cannot rewrite state law to create authority where none exists" (Dkt. 29 at 7) is beside the point. That is not what Plaintiffs are asking the Court to do. Instead, Plaintiffs ask the Court to hold unconstitutional the precedent from *Cramer*, 214 Va. at 566–67, that allows the Clerk Defendants to apply Virginia law in a way that violates the Church and its ministers' constitutional rights. A declaration from this Court that *Cramer*'s interpretation excluding Church ministers from § 20-23's ambit violates the First and Fourteenth Amendments, and an injunction prohibiting the Clerk Defendants from applying § 20-23 in such ways, is all that is required—not any "rewriting" of the statute itself.

### 2. The Church has standing to challenge the Prosecuting Defendants' enforcement of § 20-28.

The Prosecuting Defendants argue that the Church separately lacks standing to challenge their enforcement of § 20-28 because that provision can only be enforced against ministers, who they argue have no injury in fact. Dkt. 31 at 14–15. But for the reasons above, the Church has both organizational and associational standing to challenge § 20-28.

The test for organizational standing is the same as for an individual. *Md. Highways Contractors*, 933 F.2d at 1250. Here, the Church has organizational standing because the very existence of § 20-28 creates a credible threat, *Preston*, 660 F.3d at 735-36, that ministers ordained by the Church can be "confined in jail" and fined $500 for officiating a marriage in their religious capacities. Va. Code § 20-28. A religious organization has standing to challenge government action directed to third-parties when the action interferes with their mission by restricting their ability to associate with the targeted third-parties for religious purposes. *See, e.g.*, *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 312 (D. Md. 2025) (religious groups had standing to challenge ICE raids near places of worship) (citing *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 521-22 (9th Cir. 1989)). Threatening to prosecute Church ministers for engaging in ministry interferes with the Church's mission to make its ministry available to those who share its values. Compl. ¶¶ 20–24, 51, 64. The Church also has standing because the threat damages its reputation, *id.* ¶¶ 51, 64, branding the Church as second-class. *See Bostic*, 760 F.3d at 371–72.

The Church also has associational standing to challenge § 20-28. An organization has standing to bring suit "on behalf of its members when: (1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (citation omitted).

This test is easily satisfied. As to the first and third prongs, Church members are in fact participating in the suit and, as explained above, have standing to do so. The second prong is satisfied because the interests at stake are not only germane but core to the Church's purpose. The Church holds a sincere "belief in the legitimacy of every individual's calling to ministry," and its "online ordination process reflects its theological conviction that spiritual authority is not conferred by human institutions but recognized through individual conscience and divine inspiration." Compl. ¶ 23. At stake here is the viability of the Church's theological project of extending ministry to all who are called. That is surely "germane" to the Church's purpose.

3.       **Plaintiffs' claims against Defendant Falls are constitutionally ripe, and not speculative.**

Defendant Falls argues that Plaintiffs' claims against her are "hypothetical and undeveloped because" they rely on an "informal discussion with a subordinate," not formal denial of an application. Dkt. 29 at 9–10. But the question for Article III is not of formality but concreteness. Here, Clerk Falls' office told Rev. Davis he was ineligible to officiate religious wedding ceremonies under § 20-23 solely because he was ordained by the Church. Compl. ¶ 59. That "individualized notice" is a real and concrete injury. *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 188 (4th Cir. 2021) (contrasting general policy statements not ripe for resolution with individualized actions that are). And indeed, *McGeever* denied a motion to dismiss making this exact argument in response to an identical fact pattern. 2022 WL 214238, at *3 (allegation that minister was "told, pointedly, that they could not solemnize marriages" was sufficient to establish Church's standing).

Falls also argues that Plaintiffs' claims are speculative because they are "contingent upon a decision to be made by a third party that has not yet acted[.]" Dkt. 29 at 9. But *Doe v. Virginia Department of State Police*, 713 F.3d 745, 758 (4th Cir. 2013), the case on which she relies, is different. There, the plaintiff had failed to apply for relief through a designated state process that *might* have granted her relief. *Id.* Here, a deputy clerk *already* told Rev. Davis that Church ministers are ineligible to receive authorization from the City of Staunton Circuit Court Clerk under § 20-23. Compl. ¶ 59. Falls does not dispute that this is her office's policy.

The claims against Falls also satisfy the two so-called "prudential ripeness" factors, to the extent those considerations are valid. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167–68 (2014) (questioning "continuing vitality of the prudential ripeness doctrine"). First, Plaintiffs' claims are "fit[]" for decision because they are predominantly legal, and any further fact development will be primarily related to the Defendants' justifications under strict scrutiny. *Id.* at 167. Second, failure to adjudicate Falls' application of § 20-23 to the Church and its ministers now will cause Plaintiffs hardship. *Id.* at 168. Plaintiffs have already turned down requests to officiate

weddings based on reasonable fears that they could be prosecuted or that the weddings they perform could be invalidated. Compl. ¶¶ 48, 62. Forcing a plaintiff to choose between refraining from exercising First Amendment rights and exercising those rights and risking prosecution is more than enough "hardship" to warrant immediate review. *Driehaus*, 573 U.S. at 168.

### 4.    The Prosecuting Defendants have failed to establish that they are entitled to sovereign immunity.

The Prosecuting Defendants, who have authority to prosecute ministers for solemnizing marriages without authorization, are not immune from suit. Under *Ex parte Young*, 209 U.S. 123 (1908), a federal court may issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law. A state official is a proper defendant in a suit challenging a statute if the official "has some connection with the enforcement of the act." *Id.* at 157.

As the Supreme Court has recognized, "where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 276–77 (1997). *Ex parte Young* requires only a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation omitted). Plaintiffs' prayer for injunctive relief against state officials—seeking to constrain them from enforcing state laws in contravention of federal law, *see* Compl., Prayer at ¶ 99—easily satisfies that test.

The Prosecuting Defendants argue that Plaintiffs cannot challenge Virginia's marriage laws now (or ever) because no state actor has "enforced or threatened to enforce" § 20-28 against Plaintiffs. Dkt. 31 at 16–18. But actual enforcement is not necessary; what matters is that the Prosecuting Defendants undisputedly *have authority* to bring criminal proceedings under § 20-28 against individuals who solemnize marriages without legal authorization. Compl. ¶ 11 (Martin), ¶ 13 (Gaines). Their argument that they have not yet done so thus fails for the same reasons their standing argument fails. *See City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) ("significant[] overlap" of standing and *Ex parte Young*, such that often "an official's 'connection

to … enforcement' is satisfied when standing has been established"). As explained above, Plaintiffs have suffered injury in the form of chilled exercise of their First Amendment rights, and that injury is traceable to the Prosecuting Defendants as the officers responsible for enforcing the laws causing their injury. *Supra* § IV.A.1. That is enough to make the Prosecuting Defendants proper defendants under *Ex parte Young*.

*Foulke v. Virginia State Police*, 2012 WL 4356692, at *5 (W.D. Va. Sept. 24, 2012) (Dkt. 31 at 17) does not say that actual or threatened enforcement is necessary because in that case, the defendants had no enforcement responsibility at all. Here, the Prosecuting Defendants cannot deny that were Plaintiffs to solemnize marriages in contravention of Virginia law, they would have the power to prosecute under § 20-28. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) (*Ex parte Young* satisfied "even if the threat is not yet imminent"); *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 398 (5th Cir. 2025) (same). Each Prosecuting Defendant may be sued under *Ex parte Young*.

**B.     The Complaint States Claims for Relief**

Defendants also ask for dismissal under Rule 12(b)(6). But their arguments selectively read the Complaint, misstate the law, and fail to identify any defect warranting dismissal.

**1.     The Complaint states an Establishment Clause claim.**

The "clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Yet that is precisely what Plaintiffs allege: Defendants have denied legal recognition to Church ministers based on theological judgments about the Church's ordination and communal practices, while extending that recognition to ministers of other, officially favored religious societies. That is denominational favoritism, and the Establishment Clause forbids it.

The Supreme Court's recent decision in *Catholic Charities*, 605 U.S. at 238, reaffirms this principle. There, a statute exempted nonprofit organizations "operated primarily for religious purposes" from paying unemployment compensation taxes. *Id.* at 241. Applying the law, the Wisconsin Supreme Court deemed the plaintiff ineligible for the exemption, reasoning that it was

"not operated primarily for religious purposes" because it did not proselytize or serve only Catholics. *Id.* at 246. The U.S. Supreme Court reversed. Wisconsin's application of the statute violated the Establishment Clause, the Court held, because it "grants a denominational preference by explicitly differentiating between religions based on theological practices." *Id.* at 250. The decision to proselytize or to serve only members of the Catholic faith "turns on inherently religious choices," the Court explained. *Id.* "Much like a law exempting only those religious organizations that perform baptisms or worship on Sundays, an exemption that requires proselytization or exclusive service of co-religionists establishes a preference for certain religions based on the commands of their religious doctrine." *Id.*

That is *exactly* the case here. The Clerk Defendants (Compl. ¶¶ 41, 59, 69–70) apply Virginia's marriage licensing statutes in a manner that distinguishes between faiths based on the structure and perceived solemnity of their ordination practices—i.e., "the content of their religious doctrine." *Cath. Charities*, 605 U.S. at 248. State officials may not treat one denomination differently from others just because they consider its practices "less ritualistic, more unorthodox, and less formal" than other preferred religious societies. *Id.* (quoting *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953)). "Such official differentiation on theological lines" is "fundamentally foreign to our constitutional order." *Id.* at 249.

Defendants' invocation (Dkt. 29 at 10; Dkt. 25 at 10) of the "historical practices and understandings" test from *Kennedy v. Bremerton School District*, 597 U.S. 507, 535 (2022) misunderstands Plaintiff's claims. Plaintiffs *do not* challenge the licensing statutes on their face, nor take issue with Virginia's longstanding practice of vesting solemnization authority in ministers. They challenge only how Defendants *have applied those statutes* to deny recognition to Church ministers based on religious judgments about the legitimacy of their ordination. *See* Compl. ¶¶ 66–74 (claim is "[a]s [a]pplied"), Prayer ¶ 99 (seeking relief only from identified unconstitutional applications of §§ 20-23, 20-26, and 20-28).

To the extent "historical practices and understandings" are relevant, they demonstrate a consistent rejection of the denominational preferences enforced here. The Virginia Statute for

Religious Freedom, drafted by Thomas Jefferson and enacted in 1786, rejected government favoritism toward particular faiths. It guaranteed that "all men shall be free to profess, and by argument maintain, their opinions in matters of religion" and that such opinions "shall in no wise diminish, enlarge[,] or affect their civil capacities." Va. Code § 57-1. When legislators sought to insert "Jesus Christ" into the statute's preamble, the General Assembly refused. That defeat, Jefferson recalled, confirmed that the statute was "meant to comprehend, within the mantle of its protection, the Jew and the Gentile, the Christian and Mahometan, the Hindoo and infidel of every denomination." Thomas Jefferson, *Autobiography* (1821), reprinted in *The Life and Selected Writings of Thomas Jefferson* 46 (A. Koch & W. Peden eds., 2004); *see also* Arlin M. Adams & Charles J. Emmerich, *A Heritage of Religious Liberty*, 137 U. Pa. L. Rev. 1559, 1574 (1989).

Defendants' attempt to justify their denominational preference by pointing to the "substantive differences" between the Church's ordination practices and those of other faiths (Dkt. 25 at 9) amplifies the problem. For over a century, the Supreme Court has made clear that civil authorities may not sit in judgment on matters of religious doctrine or internal church governance. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 733 (1872) (courts have "no jurisdiction" to resolve disputes turning on "questions of discipline, or of faith, or ecclesiastical rule, custom, or law"); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 115 n.20 (1952) (First Amendment bars civil authorities from substituting their judgment for that of religious bodies on matters of doctrine or church governance). The Court reaffirmed and extended this principle of "ecclesiastical abstention" in *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), where it held that even ostensibly "minimal" judicial review of internal church decisions violates the First Amendment. *Id.* at 720 (state court erred by reviewing bishop defrocking). The same deference to church authority undergirds the Court's modern jurisprudence. *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 761 (2020) (attempting to define who qualifies as a minister "would risk judicial entanglement in religious issues"); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012) (even neutral civil laws cannot be used to second-guess religious organizations' selection of ministers). As Justice Thomas explained,

religious societies are guaranteed "autonomy in matters of internal governance, including the selection of those who will minister the faith." *Id.* at 196–97 (Thomas, J., concurring); *see also Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997) ("the decisions of religious entities about the appointment and removal of ministers … are beyond the ken of civil courts"). The Church, having ordained Rev. Shorts and Rev. Davis within the dictates of its doctrine, Compl. ¶¶ 20-24, 40, 56, is entitled to have that decision recognized.

The Virginia Supreme Court's decision that the Church's ordination practices are not sufficiently "considered, deliberate and responsible" to qualify under § 20-23, *Cramer*, 214 Va. at 566, is irrelevant. Much like the Wisconsin Supreme Court's vacated decision in *Catholic Charities*, 605 U.S. at 248, *Cramer* did not consider—and could not in any event resolve—the First Amendment's "guarantee of religious freedom." 214 Va. at 564. And indeed its reasoning rests on the very sort of impermissible ecclesiastical policing—e.g., that "regular communion" requires "mutual participation" or "interrelation in activity" with a religious activity, excluding solo worship, *id.* at 565—that the First Amendment forbids.

Virginia officials cannot decide which religious traditions count as sufficiently formal, structured, or "considered" to merit legal recognition. To do so is "paradigmatic" theological favoritism and a presumptively unconstitutional Establishment Clause violation subject to strict scrutiny. *Cath. Charities*, 605 U.S. at 249. No rational much less compelling government interest justifies denying the Church or its ministers the same recognition afforded to other religious societies and their ministers. Compl. ¶ 72. That is enough to state a prima facie Establishment Clause claim. *See infra* § IV.B.5 (addressing why Defendants' prematurely asserted justifications fail in any event).

### 2. The Complaint states a Free Exercise Clause claim.

Plaintiffs have also alleged a claim under the Free Exercise Clause, which "protects religious observers against unequal treatment" and "laws that impose special disabilities on the basis of religious status." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020) (citation omitted). "At a minimum," a state may not "discriminate[] against some or all religious beliefs"

or "regulate[] or prohibit[] conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). As the Complaint alleges, Defendants enforce the law in a manner that recognizes ministers of state-favored religions but deny that same recognition to Church ministers, allowing the latter officiate weddings only if they abandon their ordination and serve as civil celebrants.

The Clerk Defendants argue that Virginia's marriage laws are facially neutral and generally applicable, so only rational basis review applies to Plaintiffs' claims. Dkt. 29 at 14–16. Not so. Merely because the laws do not on their face "reference or disfavor any particular belief system," *id.*, does not mean they are neutrally applied. *See Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972) ("A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality"). The Free Exercise Clause "extends beyond facial discrimination" to forbid "subtle departures from neutrality and covert suppression of particular religious beliefs" in a law's actual applications. *Lukumi*, 508 U.S. at 534 (internal quotation marks and citation omitted). That is precisely what Plaintiffs allege here. The Clerk Defendants' have, in application, denied Plaintiffs recognition based on the structure and theological content of the Church's ordination practices. *See* Compl. ¶¶ 1–6, 18–27, 37–65, 75–82.

Nor is Clerk Defendants' enforcement generally applicable. The Clerk Defendants assess applications for ministerial recognition on a case-by-case basis and deny recognition to Church ministers based on theological judgments about their ordination. Compl. ¶¶ 35, 42–43. That kind of discretion is the antithesis of general applicability. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (law not generally applicable if it "invite[s] the government to consider the particular reason for a person's conduct by providing a mechanism for individualized exemptions") (internal quotation marks and citation omitted); *see also, e.g., Bates v. Pakseresht*, --- F.4th ----, 2025 WL 2079875, at *19 (9th Cir. July 24, 2025) (law that "incorporates ad hoc decision making based on non-objective criteria, in an area that implicates unique religious concerns" not generally applicable).

The Prosecuting Defendants claim the statutes regulate only the civil aspect of marriage. Dkt. 25 at 19–20. That argument also fails. The statutes, *as applied here*, place a substantial burden on Plaintiffs' religious practices by preventing them from officiating marriages as ministers, a core component of their religious practice. *See* Compl. ¶¶ 37–40, 48, 50–52, 54–58, 77. Plaintiffs do not claim to possess a constitutional right to solemnize marriages, as the Prosecuting Defendants suggest. Dkt. 25 at 19. They claim a constitutional right to be free from state-imposed burdens on religious exercise—specifically, the burden of being disqualified from a ministerial role "in a manner that passes judgment upon or presupposes the illegitimacy of [their] religious beliefs and practices." *Masterpiece Cakeshop v. Colorado Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018) (citing *Lukumi*, 508 U.S. at 534) (agency violated petitioner's Free Exercise rights by demonstrating hostility toward his religious practices). That is what triggers constitutional scrutiny.

That Church ministers may officiate as civil celebrants under § 20-25, Dkt. 29 at 17 & Dkt. 25 at 20, does not remedy the constitutional harm. Declaring that Church-ordained officiants do not qualify as "ministers" and shunting them to the civil-celebrant track is an official judgment about an ecclesiastical matter that this Court may not ratify. *See, e.g.*, *Fowler*, 345 U.S at 69–70 (courts may not decide that "what is a religious practice or activity for one group is not religion" even if it is "less ritualistic, more unorthodox, less formal than some"); *Kedroff*, 344 U.S. at 116 (same); *Milivojevich*, 426 U.S. at 720 (same). Moreover, it is a penalty, not an accommodation, to force Plaintiffs to either affiliate with a different religion or seek civil authorization under § 20-25—as the latter, by necessity and design, strips them of ministerial status. *See* Compl. ¶¶ 45, 60. The government cannot make the availability of a benefit turn on a minister's willingness to disavow the legitimacy of their ordination. *McDaniel v. Paty*, 435 U.S. 618, 626-29 (1978) (holding invalid Tennessee law barring ministers from serving as legislators); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (government may not condition benefit "on a basis that infringes his constitutionally protected interests," even if the "person has no 'right' to" obtain that benefit); *see also, e.g., Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) (Indiana could not require a Jehovah's Witness "to choose between" his faith "and participation in

an otherwise available public program"). Strict scrutiny applies, and Defendants cannot carry that burden. Compl. ¶ 80; *infra* § IV.B.5.

### 3. The Complaint states an Equal Protection Clause claim.

To state a claim for a violation of the Equal Protection Clause, a plaintiff need only allege: (1) state actors have treated him differently from others with whom he is similarly situated, (2) the unequal treatment was the result of intentional discrimination, and (3) the unequal treatment was not justified under the appropriate level of scrutiny. *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020). Strict scrutiny applies where government discrimination draws lines based on suspect classifications such as religion or concerns the exercise fundamental rights identified in the Constitution. *United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025) (citation omitted); *e.g.*, *RHI, Inc. v. Prince George's County*, 584 F. Supp. 2d 766, 781 n.9 (D. Md. 2008) (discriminating on the basis of religion triggers strict scrutiny under both prongs), *aff'd*, 368 F. App'x 370 (4th Cir. 2010). Plaintiffs have adequately alleged an equal protection claim that requires application of strict scrutiny—a standard Defendants cannot possibly satisfy at this stage. *Infra* § IV.B.5.

### a. The refusal to recognize ULC ministers discriminates on the basis of religion.

Religion is a suspect classification, *Roller v. Gunn*, 107 F.3d 227, 233 (4th Cir. 1997), so enforcing a law in a way "that differentiates between religions along theological lines is textbook denominational discrimination" subject to strict scrutiny. *Cath. Charities*, 605 U.S. at 248; *see also Larson*, 456 U.S. at 246, 252 (strict scrutiny applies to enforcing "a denominational preference" that "discriminate[s] *among* religions").

Rather than dispute this, the Clerk Defendants purport to quote *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338–39 (1987) for the proposition that "a law that confers a benefit on all religious groups alike, including those that do not share a particular tenet or practice, does not violate the Equal Protection Clause." Dkt. 29 at 22. That quote does not appear in *Amos*, nor have Plaintiffs located it in any federal, state, or online reporter. In any event, *Amos* affirms that "discriminating *among* religions [is] subject to

strict scrutiny[.]" 483 U.S. at 339 (quoting *Larson*, 456 U.S. at 246). That is precisely what Defendants have done here. Compl. ¶¶ 1–6, 18–27, 37–65, 83–88. And because Plaintiffs allege there is no justification for that discrimination that satisfies strict scrutiny, *id.* ¶ 86, they state a valid equal protection claim. *Fauconier*, 966 F.3d at 277.

Both sets of Defendants again focus on the asserted facial neutrality of § 20-23, § 20-26, and § 20-28. *See* Dkt. 29 at 21–24 (Clerk Defendants); Dkt. 25 at 13–15 (Prosecuting Defendants). But that is irrelevant. Plaintiffs do not claim the provisions at issue are on their face invalid, but that Defendants have applied them in a discriminatory manner. *See* Compl. ¶¶ 83–88, 99. "A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis" of some protected class, *Washington v. Davis*, 426 U.S. 229, 241 (1976), or to deny a fundamental right. *See also Martin v. Walton*, 368 U.S. 25, 28 (1961) ("A law, fair on its face, may be applied in a way that violates the Equal Protection Clause of the Fourteenth Amendment"). It thus makes no difference that § 20-23 and § 20-26 facially "afford[] a uniform benefit to *all* religions," *Amos*, 483 U.S. at 339 (citation omitted), because this case concerns Defendants' documented actions *to deny* that uniform benefit to ministers from *some religions*. *See* Compl. ¶¶ 1–6, 18–27, 37–65.

The decision in *Application of Ginsburg*, 236 Va. 165 (1988) (cited Dkt. 29 at 22 and Dkt. 25 at 16–17) holding that Quakers fit the statutory requirements of § 20-23 proves Plaintiffs' point. Church ministers are in all material respects similarly situated to ministers of the Quaker faith. Like Quaker ministers, Church ministers are "selected in accordance with the ritual, bylaws[,] or discipline" of their order, *Ginsburg*, 236 Va. at 167, which in the Church's case reflects a theological conviction that spiritual authority is not conferred by human institutions but broadly recognized through individual conscience and divine inspiration (Compl. ¶¶ 20, 23–24). And like Quaker ministers, Church ministers are "in regular communion" with the Church through recognized practices, *Ginsburg*, 236 Va. at 167, which for the Church are not limited to traditional formats like delivering weekly sermons, at particular locations, to certain congregants (Compl.

¶¶ 21–22, 26–27). That Defendants will enforce § 20-23 to recognize Quaker ministers, but *not* Church ministers, admits to the unjustifiable discrimination Plaintiffs' seek to enjoin. *Id.* ¶ 86.

### b. The refusal to recognize ULC Ministers infringes on the fundamental right to practice one's religion without government interference.

Defendants' actual and threatened application of § 20-23, § 20-26, and §20-28 also violates the Equal Protection Clause because it unevenly restricts access to a fundamental right: the right to practice one's religion on equal terms with other denominations. *See Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) (First Amendment free exercise is fundamental right).

The Clerk Defendants again claim that "solemnizing marriages" is a "state-recognized legal function," not a right "explicitly enumerated in the constitution" or "deeply rooted in the Nation's history and tradition." Dkt. 29 at 23. But the fundamental right here is not an asserted right to solemnize marriages (something Plaintiffs do not claim) but rather to practice one's religion without unequal, and targeted, state-imposed burdens. *See Larson*, 456 U.S. at 245 (the "constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause"); *see also Bowman v. United States*, 564 F.3d 765, 772 (6th Cir. 2008) (strict scrutiny applies to enforced "classification[s] affecting eligibility for benefits" based on "the exercise of religion"). By categorically refusing to allow Church ministers to enjoy the same privileges as equally stationed ministers of other religious orders, Defendants infringe on Church ministers' fundamental rights to fulfill their religious calling. *See* Compl. ¶¶ 37–40, 48, 50–52, 54–58, 77. That arbitrary restriction, unjustified by any legitimate much less compelling state interest, violates the Equal Protection Clause. *Id.* ¶ 86; *infra* § IV.B.5.

### 4. The Complaint states a Free Speech claim.

Defendants' actual and threatened enforcement of Virginia's marriage laws against the Church and its ministers burdens speech based on its content and viewpoint, and is accordingly subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Neither set of Defendants can satisfy that standard, and certainly not at this stage. *See infra* § IV.B.5.

***Officiating a wedding is protected expression.*** Defendants' conduct implicates the First Amendment because officiating a wedding is protected expression that communicates "particularized message[s]" about commitment, spirituality, and the couple's relationship to each other and to their community. *Kaahumanu*, 682 F.3d at 799. For Church ministers, performing weddings is a form of religious and expressive practice—one that reflects their identity, values, and theology. Compl. ¶¶ 22, 39, 54. The decision in *Rumsfeld v. FAIR*, 547 U.S. 47 (2006) (Dkt. 29 at 24), by contrast, concerned the selection of employers invited to campus job fairs. Those operational choices are nothing like the expressive and symbolic choices involved in a wedding ceremony—such as the selection of readings and speakers, contents of sermons and vows, performance of rituals like ring exchanges, and design of the altar. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 572–74 (1995) (curating elements of a parade is a similarly expressive exercise protected by the First Amendment). Nor does *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) (Dkt. 25 at 21-22), help Defendants, as there was "no suggestion" that adults excluded from entering dance halls for children wished to engage in any protected, lawful associations with the children inside.

The First Amendment's protections for free speech accordingly apply, and Plaintiffs have alleged that Defendants' conduct violates several independent free-speech doctrines.

***Unconstitutional condition.*** Plaintiffs have adequately stated a First Amendment claim because Defendants' enforcement of Virginia's marriage laws conditions government benefits— both a minister's authority to administer recognized marriage rites and a couple's right to have an ordained religious officiant solemnize their wedding—upon associating with the government's preferred religious societies. *See Perry*, 408 U.S. at 597 (government may not deny benefit on basis that infringes constitutional right); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). This attempt to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion" is impermissible. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). It is also akin to a prior restraint. *Cf. Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552-57 (1975) (similar licensing scheme imposed a prior restraint

notwithstanding availability of unlicensed alternatives to disseminate the expression). That enforcement of Virginia's marriage laws does not *ban* a minister's religious beliefs (Dkt. 29 at 25) is irrelevant: the "distinction between laws burdening and laws banning speech is but a matter of degree." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011) (state officials "may no more silence unwanted speech by burdening its utterance than by censoring its content").

*Viewpoint discrimination.* Defendants' actual and threatened enforcement of Virginia's marriage laws constitutes viewpoint discrimination. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995) (denying public funding to student newspaper with Christian editorial viewpoint violated Free Speech Clause). Defendants' denial of officiation privileges to Church ministers burdens those ministers' expressive choices to become ordained with the Church, Compl. ¶¶ 48–52, 62–65, and the Church's ability to disseminate its doctrine and teachings, *id.* ¶¶ 20–24, 51, 64. It also penalizes the Church for maintaining an ecclesiastical view that online ordination is valid and sacred, and that a minister may be in regular communion with a religious society in nontraditional ways. Compl. ¶¶ 18–24, 26–27. Avoiding the disability imposed by Defendants' application of § 20-23, § 20-26, and § 20-28 would compel Plaintiffs to "profoundly alter[] [their] choices about the views they will, and will not, convey." *Moody v. NetChoice, LLC*, 603 U.S. 707, 737, 742–44 (2024) (official actions that "alter [a] speaker's own expression" fail any level of First Amendment scrutiny); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (compelling religious plaintiff to express views at odds with her faith to avoid liability violated First Amendment). The Clerk Defendants' position that Virginia's marriage laws apply "neutral, structural criteria" to determine what sorts of ministers to recognize, Dkt. 29 at 25, is (again) irrelevant. The problem is that the Defendants' enforcement of that criteria categorically excludes the Church and its ministers *because of their beliefs*. Official action that enforces a facially content neutral law is presumptively unconstitutional and subject to strict scrutiny when, as here, that enforcement "cannot be justified without reference to the content of the regulated

speech" or else reflects "disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (internal quotation marks and citation omitted).

  ***Speaker-based restriction.*** Defendants' conduct restricts speech on the basis of speaker identity because it denies legal effect to religious expression from a disfavored class of speakers: those ordained by the Church. The act of ordination communicates core theological beliefs about ministry, legitimacy, and spiritual authority. Compl. ¶¶ 20–24. By conditioning the legal recognition of this expressive act on the speaker's religious affiliation and method of ordination, Defendants' enforcement draws impermissible distinctions between who may speak and whose speech the state will acknowledge. Such speaker-based distinctions—particularly when tied to religious identity and thus use the identity of a speaker as a proxy for viewpoint—are presumptively unconstitutional. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994).

  Because no legitimate much less compelling interest justifies these restrictions on their speech, Compl. ¶ 96, Plaintiffs state a claim under the Free Speech Clause. *See also infra* § IV.B.5.

  **5.  Plaintiffs allege Defendants' failure to satisfy strict scrutiny.**

  Strict scrutiny applies to Defendants' conduct because Plaintiffs have adequately alleged claims for violations of the Establishment, Free Exercise, Equal Protection, and Free Speech Clauses of the First and Fourteenth Amendments. *Supra* §§ IV.B.1-4. Defendants arguments to dismiss those claims because they have purportedly satisfied that standard on the pleadings are premature, and in any event, utterly unmerited.

  First, Defendants' arguments are premature. Well-pled allegations that government action invades a constitutional right and triggers strict scrutiny is sufficient to state a Section 1983 claim. *See Martin*, 980 F.2d at 952, 958 (motion to dismiss Section 1983 claim does not test sufficiency of government's justifications); *e.g.*, *Brown v. District of Columbia*, 390 F. Supp. 3d 114, 126–27 (D.D.C. 2019) (Brown-Jackson, J.) (denying as premature motion to dismiss arguing that scrutiny was satisfied); *Smith v. District of Columbia*, 387 F. Supp. 3d 8, 30 (D.D.C. 2019) (same). Whether the government defendants can satisfy scrutiny "is not before" the Court, *Martin*, 980 F.3d at 958,

and will turn on "complex and overlapping legal and factual determinations" on which they will bear the burden of proof. *Brown*, 390 F. Supp. 3d at 126.

Second, Plaintiffs *do* allege that Defendants' actual and threatened enforcement of § 20-23, § 20-26, and §20-28 against the Church and its ministers is not sufficiently tailored. *See* Compl. ¶¶ 72, 80, 86, 96. "Strict scrutiny is unforgiving" and "requires a restriction to be the least restrictive means of achieving a compelling governmental interest." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2310 (2025). Under that standard, government action enforcing a denominational preference "must be invalidated unless it is justified by a compelling governmental interest and is closely fitted to further that interest." *Cath. Charities*, 605 U.S. at 252 (internal quotation marks and citation omitted). Government defendants must not only identify an interest "of the highest order," but demonstrate that their action actually "advances" that interest in a direct and material way. *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2361 (2025) (quoting *Fulton*, 593 U.S. at 541). This standard requires a demonstrated "direct causal link"—not just a "predictive judgment that such a link exists"—between the official action and the interest to be advanced. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011).

Here, Defendants argue that their enforcement of § 20-23, § 20-26, and § 20-28 to exclude the Church and its ministers ensures that officiants are "persons of integrity and responsibility," Dkt. 29 at 19 (Clerk Defendants), who will be "accountable for any errors or failures to complete the marriage licensing process," and "accurately and timely record the marriage license." Dkt. 25 at 14, 18 (Prosecuting Defendants). Yet none of the Defendants present any evidence, much less causal proof, that every minister ordained by the Church—a group that includes everyone from the Plaintiffs to California Governor Gavin Newsom, Katie Couric, and Tom Hanks—categorically lacks the requisite integrity to appear at weddings and ensure that marriage licenses are properly filed. The Church ordains ministers who every year perform and record thousands of weddings in most every state without issue. The naked contention that all of these ministers are not moral enough to officiate wedding ceremonies in Virginia is not just irrational, but offensive. *See Romer*

*v. Evans*, 517 U.S. 620, 632-35 (1996) (official action "inexplicable by anything but animus toward the class it affects" fails even rational basis review).

Similarly, Defendants present no evidence that recognized ministers ordained by *other* religions are somehow more responsible and marked by greater character, such that recognizing them supports accountability—to the contrary, one of Defendant Landes' preferred ministers would not even leave her car to perform Rev. Shorts' mother's wedding. Compl. ¶ 47. This "raises serious doubts about whether the government is in fact pursuing the interest it invokes," *Brown*, 564 U.S. at 802, and leaves "appreciable damage to the … supposedly vital interest unprohibited," *Cath. Charities*, 605 U.S. at 253 (citation omitted).

Nor have Defendants explained why another mechanism—such as fining ministers who fail to file documents, no matter how ordained—would not more effectively advance their asserted interest. *See Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (government burdening religious practice must show that "employing less restrictive measures" would fail (citing *Cuomo*, 592 U.S. at 19)).

Although a motion to dismiss is not a proper vehicle to adjudicate the justifications for Defendants' denominational discrimination, the justifications Defendants proffer confirm that they will "fail[] to explain how the theological lines drawn" by their enforcement is narrowly tailored to promote an interest in reliably filed paperwork. *Cath. Charities*, 605 U.S. at 252.

## V.  CONCLUSION

The motions to dismiss should be denied. Plaintiffs respectfully request an opportunity to present oral argument on the motions, at the Court's convenience.

Dated: August 11, 2025.

By /s/      Adam S. Sieff
        Adam S. Sieff

DAVIS WRIGHT TREMAINE, LLP
Ambika Kumar (pro hac vice)
Bianca G. Chamusco (pro hac vice)
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Tel:  206.622.3150
ambikakumar@dwt.com
biancachamusco@dwt.com

DAVIS WRIGHT TREMAINE, LLP
Adam S. Sieff (pro hac vice)
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Tel:  213.633.8618
adamsieff@dwt.com

GLENN, FELDMANN, DARBY & GOODLATTE
Paul G. Beers (VSB # 26725)
111 Franklin Road, S.E., Suite 200
Roanoke, Virginia 24001-2887
Tel:  540-224-8000
pbeers@glennfeldmann.com

*Attorneys for Plaintiffs Universal Life Church Monastery Storehouse, Rev. Jaylen N. Shorts, and Rev. Michael E. Davis.*

**CERTIFICATE OF SERVICE**

I certify that on August 11, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

DAVIS WRIGHT TREMAINE LLP

By */s/      Adam S. Sieff*
          Adam S. Sieff