UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| UNIVERSAL LIFE CHURCH<br>MONASTERY STOREHOUSE, et al, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No.:   5:25-cv-00047 |
| | ) | |
| R. STEVEN LANDES, et al, | ) | |
| | ) | |
| Defendants | ) | |

**DEFENDANTS LANDES AND FALLS' REPLY TO PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS**

Defendants, R. Steven Landes and Staci N. Falls, by counsel, file this reply to Plaintiff's opposition to Defendants' motion to dismiss as follows:

Plaintiffs' opposition confirms that their claims rest not on any constitutional violation, but on dissatisfaction with Virginia's neutral and historically grounded statutory framework. They ask this Court to override binding precedent and compel the Clerk Defendants to issue celebrant licenses to individuals who do not meet the statutory criteria, effectively rewriting Virginia law. Their arguments mischaracterize the nature of the statutory requirements, ignore the availability of alternative pathways under § 20-25, and fail to plausibly allege any constitutional violation.

I.      **Lack of Jurisdiction**

Plaintiffs' claims fail the redressability prong of Article III standing because the relief they seek, a judicial order compelling the Clerk Defendants to issue celebrant licenses under Va. Code §§ 20-23 or 20-26, would require this Court to rewrite Virginia law to expand its scope beyond the statutory language.

1

Plaintiffs assert that they are in "regular communion" with the Universal Life Church (ULC) and therefore meet the statutory criteria under § 20-23. But this assertion is conclusory and legally insufficient under binding Virginia precedent. In *Cramer*, the Virginia Supreme Court held that "regular communion" requires more than self-identification or personal belief, it requires mutual participation in a structured religious society that exercises oversight and accountability over its ministers.

Plaintiffs do not allege that they were selected or vetted by any religious body. They affirmatively state that ULC ordains anyone who requests it online, without doctrinal requirements, centralized leadership, or formal congregational structure. Their definition of "regular communion" departs from the administrative, structural, and accountability standards required § 20-23 as construed by *Cramer*. While Plaintiffs may sincerely believe they are in communion with the Church, the statutory framework, construed by the Virginia Supreme Court, requires more than subjective affiliation.

Even if Plaintiffs were correct that § 20-23 is unconstitutional as applied, their claims still fail the redressability prong. The Clerk Defendants are limited to the authority granted to them by statute. If Plaintiffs do not meet the statutory criteria, the Clerks have no legal power to issue celebrant licenses under § 20-23 or § 20-26. The only way Plaintiffs could obtain such relief would be if the Court compelled the Clerks to issue licenses to individuals who do not qualify under the statute as written. That would require the Court to expand the definition of "ordination" and "regular communion" to encompass self-directed, unstructured affiliation which is an interpretation that departs from the statutory text and the Virginia Supreme Court's binding construction in *Cramer*. Such relief would not merely enjoin enforcement; it would effectively

2

rewrite the statute to create new categories of eligibility. That is a legislative function, not a judicial one.

Because the Clerk Defendants are bound by the statutory framework and Plaintiffs do not meet the statutory criteria, their alleged injuries cannot be redressed by a favorable decision in this case. The mismatch between the relief sought and the legal authority of the Clerk Defendants renders the claims nonjusticiable.

Plaintiffs' claims against Clerk Falls are not ripe for judicial review because they rest on speculative and undeveloped allegations. The Complaint does not allege that either Plaintiff submitted a formal application to Clerk Falls or received an official denial. Instead, Plaintiffs rely solely on an informal conversation with a deputy clerk, in which Rev. Davis was allegedly told that he would not be authorized under § 20-23 due to his ULC ordination. This type of informal, secondhand communication is insufficient to establish a concrete dispute suitable for adjudication.

Ripeness requires a showing that the dispute is sufficiently definite and that the alleged injury is not contingent on future events. *See Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). Here, Plaintiffs never submitted a formal application to Clerk Falls, never received a denial, and never pursued any of the available statutory remedies under § 20-25 or § 20-26. Their claims are based entirely on assumptions about how Clerk Falls might respond to a hypothetical application, not on any concrete action taken by her office.

Moreover, the ripeness doctrine is designed to prevent courts from issuing advisory opinions on abstract or hypothetical disputes. *Md. Right to Life State PAC v. Weathersbee*, 975 F. Supp. 791, 795 (D. Md. 1997); *see also Jackson v. Jackson*, 857 F.2d 951, 955 n.1 (4th Cir. 1988). Plaintiffs' failure to engage in the statutory process, by submitting an application, seeking judicial

authorization, or requesting designation under § 20-26, means there is no actual controversy. Without a formal denial or adverse action, there is no basis for judicial intervention.

Plaintiffs' reliance on informal conversations with clerk staff does not transform their claims into a live controversy. The absence of any formal application or denial confirms that their alleged injury is speculative and contingent. Because Plaintiffs have not pursued the available statutory avenues and have not been subject to any official action by Clerk Falls, their claims are not ripe and should be dismissed.

## II.    Establishment Clause Claim

### A.    Plaintiffs Fail to Engage with the Governing Standard Under *Kennedy*

The Supreme Court's decision in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), reaffirmed that Establishment Clause claims must be evaluated in light of "historical practices and understandings." *Id*. at 538–39. The Court rejected the *Lemon* test and clarified that the Establishment Clause does not prohibit all government interaction with religion. Instead, courts must ask whether the challenged practice is consistent with the Nation's historical traditions of church–state relations.

Plaintiffs do not meaningfully engage with this standard. They do not dispute the long-standing tradition of vesting marriage solemnization authority in ministers who are institutionally accountable and regularly engaged in religious ministry. Nor do they challenge the historical legitimacy of requiring officiants to be part of a functioning religious society. That tradition dates back to colonial marriage laws and has persisted through centuries of American legal practice. Virginia's requirement that ministers be in "regular communion" with a religious society is entirely consistent with that tradition. It ensures that those performing legally significant ceremonies are part of a community that can verify their status and ensure accountability.

4

Plaintiffs attempt to invoke the Virginia Statute for Religious Freedom, drafted by Thomas Jefferson and enacted in 1786, to argue that historical practice supports their position. They cite Jefferson's statement that the statute was "meant to comprehend, within the mantle of its protection, the Jew and the Gentile, the Christian and Mahometan, the Hindoo and infidel of every denomination." But this argument conflates two distinct constitutional principles. The Virginia Statute for Religious Freedom stands for the proposition that religious belief should not affect one's civil capacities. Va. Code § 57-1. That principle is fully honored by Virginia's marriage laws, which do not disqualify anyone from participating in civil life based on belief.

What Jefferson's statute does not guarantee is that every religious tradition will be authorized to perform every civil function in precisely the manner it prefers. The Establishment Clause prohibits denominational favoritism, not administrative standards. Virginia's requirement that celebrants be part of a functioning religious society is not a theological test; rather it is a neutral safeguard designed to ensure legal reliability and public accountability. Plaintiffs' dissatisfaction with the outcome of applying § 20-23 to their particular ordination model does not transform a historically grounded, neutral framework into a constitutional violation.

## B. *Catholic Charities* Does Not Apply as There Was No Denominational Preference

Plaintiffs rely heavily on *Catholic Charities Bureau v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), to argue that Virginia's statute draws unconstitutional denominational distinctions. But their reliance is misplaced. In *Catholic Charities*, the Wisconsin Supreme Court denied a religious exemption because the petitioners neither proselytized nor limited their services to co-religionists. The U.S. Supreme Court reversed, holding that the state's interpretation imposed a theological litmus test by conditioning eligibility on doctrinal choices. *Id.* at 248–50.

Virginia's statute does no such thing. The requirement of "regular communion" under Va. Code § 20-23 is a neutral, administrative structural criterion. It applies equally to all religious societies, regardless of belief. It does not ask what ministers believe or whether they evangelize. It asks whether they are part of a religious society that exercises mutual participation and accountability. That is a secular inquiry into organizational structure, not a theological judgment.

Plaintiffs argue that *Cramer* rests on impermissible "ecclesiastical policing" because it excludes solo worship and requires mutual participation. But this argument misapprehends both *Cramer* and the constitutional framework. The Virginia Supreme Court in *Cramer* did not evaluate the legitimacy of ULC's beliefs, doctrines, or internal governance. It interpreted the statutory phrase "regular communion" to require a demonstrable, ongoing relationship between a minister and a religious society that involved mutual engagement and accountability. *See Cramer*, 214 Va. at 565–66. That interpretation reflects a structural and administrative, not theological, inquiry. It does not ask whether a minister's beliefs are orthodox, whether their ordination is spiritually valid, or whether their religious practices are sincere. It asks whether the minister is part of a religious organization that functions as a community, capable of verifying and supporting its ministers in the performance of legal duties.

This is precisely where *Cramer* diverges from the Wisconsin Supreme Court's reasoning in *Catholic Charities*. In *Catholic Charities*, the state conditioned a legal benefit on theological criteria, specifically, whether the organization proselytized or served only co-religionists. *Cramer*, by contrast, applies a neutral statutory standard that does not depend on what a minister believes, but on whether they are institutionally connected to a religious body to ensure accountability. Plaintiffs' attempt to equate "regular communion" with theological favoritism ignores this distinction.

Plaintiffs also misapply the ecclesiastical abstention doctrine. That doctrine prohibits civil courts from resolving internal religious disputes, such as contested removals of clergy or doctrinal disagreements within a church. *See Dixon v. Edwards*, 290 F.3d 699, 714–15 (4th Cir. 2002). But there is no such dispute here. Plaintiffs are not asking the Court to adjudicate a conflict within ULC, and the Clerk Defendants are not evaluating religious law or doctrine. They are applying a statutory eligibility standard under Virginia law. That is a legal question, not a theological one. The First Amendment does not prohibit legislatures from requiring administrative criteria for the performance of civil functions, especially when those criteria are applied uniformly and without regard to religious belief.

While Plaintiffs argue that Virginia law categorically excludes ULC ministers from all paths to authorization, that claim is incorrect. Virginia law provides a clear and accessible pathway under § 20-25, which allows any individual, regardless of religious affiliation or ordination status, to petition for civil celebrant authority. Plaintiffs were not denied access to § 20-25; they declined to pursue it.

## III. Free Exercise Clause Claim

Plaintiffs allege that Virginia's statutory framework burdens their religious exercise by denying them the ability to solemnize marriages as ministers of the Universal Life Church (ULC). They argue that the statute is not neutrally applied and that its enforcement reflects covert suppression of particular religious beliefs. But this claim fails under the governing constitutional standard. The Free Exercise Clause does not prohibit neutral laws of general applicability that incidentally burden religious practice. *See Canaan Christian Church v. Montgomery Cty.*, 29 F.4th 182, 198 (4th Cir. 2022)

Virginia Code § 20-23 is facially neutral and generally applicable. It applies the same criteria, proof of ordination and regular communion with a religious society, to all ministers, regardless of denomination. The statute does not inquire into religious beliefs or impose doctrinal requirements. It sets administrative prerequisites to ensure that those authorized to solemnize marriages are institutionally accountable and part of a functioning religious body.

Plaintiffs have not alleged facts showing they meet those criteria. They do not claim to have been selected or vetted by a religious society, nor do they allege ongoing ministerial activity within a structured religious community. Instead, they affirmatively state that ULC ordains anyone who requests it online, without doctrinal requirements, centralized leadership, or formal congregational structure. That model does not satisfy the statutory standard, and the resulting exclusion is based on organizational structure, not religious belief.

Plaintiffs also argue that the statute invites ad hoc decision-making and individualized exemptions. But that argument mischaracterizes the statute. Virginia law does not provide discretionary exemptions. It sets fixed eligibility criteria. The denial of Plaintiffs' applications was based on those criteria, not on subjective or theological judgments. The statute does not empower clerks to evaluate religious doctrine or grant exemptions based on belief. It applies uniformly to all applicants.

Moreover, Plaintiffs did not pursue authorization under § 20-25. Virginia law provides a secular route under § 20-25, which allows any individual, regardless of religious affiliation, to petition for civil celebrant authority. Plaintiffs declined to pursue that route, not because it was unavailable, but because they preferred religious recognition under § 20-23. That preference does not transform a neutral administrative framework into a constitutional violation.

8

Plaintiffs conflate the denial of legal authority to solemnize marriages with suppression of religious belief. But the Free Exercise Clause does not guarantee that every religious act will carry civil legal effect. Plaintiffs retain full freedom to minister, preach, counsel, and perform religious ceremonies. What they cannot do, absent meeting the statutory criteria, is solemnize marriages with legal effect under Virginia law.

This distinction is constitutionally significant. The state's interest in regulating marriage solemnization is not to control religious practice, but to ensure the legal validity of marriages, proper recordkeeping, and public accountability. Plaintiffs are free to perform religious wedding ceremonies in accordance with their beliefs. The statute merely limits who may confer legal marital status. That limitation does not burden religious exercise within the meaning of the First Amendment.

Plaintiffs further argue that "declaring that Church-ordained officiants do not qualify as 'ministers' and shunting them to the civil-celebrant track is an official judgment about an ecclesiastical matter that this Court may not ratify." That assertion mischaracterizes both the statute and the nature of the inquiry. Virginia Code § 20-23 does not empower state officials to make theological judgments about who qualifies as a minister. It sets forth administrative criteria, namely, that the applicant be an ordained minister in regular communion with a religious society. The determination of whether an applicant meets those criteria is not a theological or ecclesiastical judgment; it is a legal assessment of whether the applicant satisfies the accountability prerequisites for performing a civil function.

The exclusion of ULC ministers from § 20-23 is not based on disbelief in their religious sincerity or a rejection of their theology. It is based on the undisputed fact that ULC ministers lack the accountability required by Virginia. ULC ordains anyone who requests it online, without any

communal vetting, oversight, or ongoing religious engagement. That model does not satisfy the statutory requirement of ordination or regular communion, as construed by the Virginia Supreme Court in *Cramer*.

Moreover, the availability of § 20-25 confirms that Virginia law does not bar ULC ministers from solemnizing marriages. It provides a secular pathway for any individual, regardless of religious affiliation or ordination status, to obtain celebrant authority. Plaintiffs remain free to officiate religious ceremonies and to identify as ministers. The availability of § 20-25 ensures that they can also perform legally recognized marriages, provided they meet the same procedural requirements as any other lay celebrant. That is not a penalty, it is a neutral, inclusive mechanism for legal solemnization.

## IV.    Equal Protection Clause Claim

Plaintiffs allege that Virginia's statutory framework has been applied in a discriminatory manner, pointing to the fact that ministers from other religious traditions, such as Quakers, have been authorized to solemnize marriages under Va. Code § 20-23, while ULC ministers have been denied that same authority. They argue that this differential treatment violates the Equal Protection Clause because similarly situated individuals are being treated unequally based on religion.

But Plaintiffs' claim fails at the threshold. To state a valid Equal Protection claim, they must show that they are similarly situated to those who received the benefit. *See Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020). Plaintiffs have not done so. Quaker ministers meet the statutory criteria. As the Virginia Supreme Court explained in *Application of Ginsburg*, 236 Va. 165, 167 (1988), Quaker ministers are selected in accordance with the ritual, bylaws, or discipline of their religious society and are in regular communion with that society through ongoing religious engagement.  Thus, Quakers met the administrative accountability standards in the statute.

Plaintiffs do not allege comparable facts. They affirmatively state that ULC ordains anyone who requests it online, without doctrinal requirements, centralized leadership, or formal congregational structure. They do not claim to have been selected or vetted by a religious body, nor do they allege ongoing ministerial activity within a structured religious community. They are accountable to no one, as anyone who feels a call to serve can become a minister. Compl. ¶ 20. Without the requisite level of accountability in the ordination process and through regular communion as set forth in *Cramer*, Plaintiffs do not meet the statutory criteria and they do not claim that they do.

Plaintiffs also challenge the Clerk Defendants' reliance on *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327 (1987), arguing that the cited language does not appear verbatim in the opinion and that *Amos* affirms that "discriminating among religions [is] subject to strict scrutiny." Plaintiffs are correct that the specific phrase cited does not appear in *Amos* in those exact words. However, the legal principle is consistent with the Court's reasoning. *Amos* held that strict scrutiny applies when a law discriminates among religions, but not when a law affords a uniform benefit to all religions and is motivated by a permissible purpose. *Id*. at 339. In such cases, the Court applied the *Lemon* test, not strict scrutiny.

That distinction is critical. *Amos* reaffirmed that strict scrutiny is reserved for laws that draw denominational lines. It does not apply to facially neutral statutes that confer benefits uniformly across religious groups, even if some groups qualify and others do not. Virginia's statute does exactly that: it applies uniform structural and administrative criteria to all applicants, regardless of denomination. The differential outcomes result from differences in organizational structure, not from denominational favoritism or theological judgment.

Plaintiffs have not shown that Virginia's statute draws lines based on religious belief or doctrine. They have not alleged facts showing that ULC ministers are similarly situated to ministers who meet the statutory criteria. Because the statute applies the same eligibility standard to all religious groups, and because Plaintiffs do not meet that standard, their Equal Protection claim fails.

Plaintiffs also argue that enforcement of §§ 20-23, 20-26, and 20-28 violates the Equal Protection Clause by imposing unequal burdens on their fundamental right to practice religion. But this argument conflates the right to religious belief and expression with the legal authority to perform a civil function. The right to practice religion is indeed fundamental, but Virginia's statute does not restrict Plaintiffs' ability to minister, preach, or perform religious ceremonies. It regulates who may solemnize marriages with legal effect which is a civil role that carries legal consequences. Plaintiffs remain free to officiate religious weddings; they are simply required to meet uniform administrative criteria to confer legal marital status. That is not a burden on religious exercise; it is a neutral condition on the performance of a public legal function. Because the statute does not target religious belief or practice and applies the same criteria to all applicants, it does not infringe on any fundamental right protected by the Equal Protection Clause.

## V.    Free Speech Claim

### A.  The Statutes Regulate Conduct, not Expression

Plaintiffs allege that Virginia's statutory framework violates the Free Speech Clause by burdening their ability to perform marriage ceremonies, which they characterize as expressive religious acts. They rely on *Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012), to argue that officiating a wedding is protected expressive conduct. In *Kaahumanu*, the Ninth Circuit noted that the content of wedding ceremonies, including the selection of readings, vows, and rituals,

constitutes protected speech under the First Amendment. *Id*. ("Wedding ceremonies convey important messages about the couple, their beliefs, and their relationship to each other and to their community").

*Kaahumanu* is not controlling here, and its reasoning does not support Plaintiffs' claim. The statute at issue in *Kaahumanu* regulated commercial weddings on public beaches. *Id*. at 795. It provided no limitation on the people who may be involved in a wedding, what they could wear or what they could say. *Id*. The court made no statements related to the legal act of officiating weddings with civil effect.  In contrast, Virginia's statute does not regulate the content of wedding ceremonies, the location of ceremonies, or the expressive conduct of officiants. It does not restrict what officiants may say, what rituals they may perform, or what messages they may convey. Plaintiffs remain free to conduct religious wedding ceremonies in accordance with their beliefs.

What Virginia regulates is who may confer legal marital status, a civil function that carries legal consequences and requires administrative accountability. The expressive aspects of the ceremony, sermons, vows, blessings, and symbolic acts, remain fully protected. Plaintiffs may preach, counsel, and officiate religious rites without interference. What they cannot do, absent meeting the statutory criteria, is give those ceremonies legal effect under state law. That limitation does not burden expressive conduct, it governs the legal consequences of the act, not its expressive content.

### B.    No Viewpoint Discrimination or Speaker-Based Restriction

Plaintiffs argue that Virginia's statutory framework constitutes viewpoint discrimination because it denies legal recognition to ministers who hold and express certain theological beliefs. They claim this denial burdens the Church's ability to disseminate its doctrine and forces ministers

to alter their expressive choices to avoid exclusion. They do not elucidate in what manner their speech is altered.

Virginia's statute does not regulate speech, religious doctrine, or expressive conduct. It does not prohibit ULC ministers from preaching, counseling, conducting religious ceremonies, or expressing their beliefs. Plaintiffs remain free to perform weddings as religious rites and to communicate their theological views. What the statute regulates is who may confer legal marital status, a civil function that carries legal consequences and requires administrative oversight. That regulation is not based on viewpoint; it is based on structural criteria applied uniformly to all applicants.

Plaintiffs' reliance on *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)(denying funds to organization *because* they were engaged in religious activity violated free speech), and *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (remanding case for further development related to whether social media platform's content moderation activities were protected speech) is misplaced. Those cases involved government efforts to suppress or compel specific ideological messages. Here, Virginia does not compel ULC ministers to adopt different beliefs or censor their religious expression. It simply requires that those seeking legal authority to solemnize marriages meet neutral eligibility standards. The statute does not disfavor the Church's message, it applies the same criteria to all religious groups.

Plaintiffs claim that Virginia's marriage laws compel them to "profoundly alter[] [their] choices about the views they will, and will not, convey," but they fail to explain how their speech is actually burdened. The statutes do not regulate the content of wedding ceremonies, sermons, or religious messages. Plaintiffs allege viewpoint discrimination, yet they identify no specific message that the state has suppressed or disagreed with. The statutory framework does not restrict

14

what ULC ministers may say or believe; rather it regulates who may perform a civil legal function. Plaintiffs remain free to officiate religious ceremonies and express their theological views without limitation.Notably, Plaintiffs ignore the provisions of Va. Code Ann. § 20-25, which provides an alternative pathway for ULC ministers to obtain celebrant authority. That provision does not require applicants to adopt or renounce any belief, take any oath, or convey any particular message. In fact is expressly states that no oath is required.  Plaintiffs' refusal to pursue that option does not transform a neutral administrative process into viewpoint discrimination.

### C.    No Unconstitutional Condition

Plaintiffs argue that Virginia's statutory framework imposes an unconstitutional condition by requiring ministers and couples to associate with "government-preferred religious societies" to access the legal benefits of marriage solemnization. They cite *Perry v. Sindermann*, 408 U.S. 593 (1972), and *Agency for Int'l Dev. v. Alliance for Open Society Int'l*, 570 U.S. 205 (2013), to claim that the state is conditioning a benefit on the surrender of constitutional rights.

Virginia does not condition the right to speak, minister, or perform religious ceremonies on any affiliation. Plaintiffs remain free to officiate weddings, preach, and express their religious beliefs. The statute regulates only who may confer legal marital status which is a civil function that carries legal consequences and requires administrative accountability. That is not a restriction on speech or religious exercise; it is a neutral eligibility requirement for performing a legal act.

Moreover, Plaintiffs' reliance on *Perry* and *Alliance for Open Society* is misplaced. Those cases involved direct conditioning of government benefits on the adoption or renunciation of specific viewpoints. Here, Virginia does not require ULC ministers to change their beliefs or speech. It simply requires that those seeking legal authority to solemnize marriages meet structural criteria that apply equally to all applicants, regardless of viewpoint or doctrine.

Finally, Plaintiffs' analogy to prior restraint fails. Virginia does not require preapproval of speech or religious expression. It does not censor content or restrict access to expressive platforms. It regulates only the legal effect of a ceremony, not its expressive content. It is a neutral administrative safeguard tied to the state's interest in ensuring the integrity of marriage records and legal solemnization.

### D.    No speaker based restriction

Plaintiffs argue that Virginia's statutory framework imposes a speaker-based restriction by denying legal effect to religious expression from a "disfavored class of speakers". But this argument conflates the regulation of a civil legal function with the regulation of speech. The statute does not restrict who may speak, preach, minister, or officiate religious ceremonies. Plaintiffs remain free to express their theological views and perform weddings as religious rites. What Virginia regulates is who may solemnize marriages that carry legal consequences and requires administrative oversight.

Plaintiffs also fail to explain how their speech is actually burdened. They do not allege that the content of their ceremonies is censored, nor do they identify any expressive message they are prohibited from conveying. The act of ordination may reflect theological beliefs, but Virginia does not regulate ordination in this instance. It regulates eligibility to perform a legal act. Plaintiffs' expressive conduct remains intact.

### VI.    Plaintiffs' Strict Scrutiny Argument Fails

### A.  Virginia's Compelling Interest Is Undisputed and Well-Established

Plaintiffs do not dispute that Virginia has a compelling interest in regulating the legal solemnization of marriage. As the Virginia Supreme Court recognized in *Cramer*, the Commonwealth has a "vital interest" in the marriage contract and in ensuring that it is solemnized

by individuals who are "persons of integrity and responsibility," capable of properly executing and reporting the legal documentation. *Cramer*, 214 Va. at 564-67. This interest is not in the religious content of ceremonies, but in the legal reliability and administrative integrity of the marriage process.

The U.S. Supreme Court has likewise affirmed that marriage is a civil institution subject to legislative control. *See Maynard v. Hill*, 125 U.S. 190, 205 (1888) ("Marriage… has always been subject to the control of the legislature."); *Boddie v. Connecticut*, 401 U.S. 371, 389–90 (1971) (Black, J., dissenting) (States have plenary power over marriage except as limited by specific constitutional provisions). Virginia's statutory framework reflects this authority and is designed to ensure that solemnization is performed by individuals subject to meaningful oversight, whether religious or civil. No fact-intensive inquiry is needed to validate that interest.

The importance of this interest is underscored by the consequences of improper solemnization, as illustrated in *Levick v. MacDougall*, 294 Va. 283, 805 S.E.2d 775 (2017). There, a rabbi officiated a ceremony, mishandling or bungling the paperwork, leading to years of litigation, including disputes over spousal support, property division, and the enforceability of a marital agreement. *Id*. at 288-290. The case demonstrates the importance of the solemnization process and the significant legal and financial harm that can result from mishandling of that process. Virginia's statutory framework is designed to prevent precisely this kind of uncertainty.

### B. Constitutional Questions Involving Strict Scrutiny can be decided on a Motion to Dismiss

Plaintiffs contend that any attempt to defend the statute under strict scrutiny is premature at the motion-to-dismiss stage. But courts must dismiss constitutional claims where the complaint fails to plausibly allege that the challenged law burdens a protected right or fails to meet strict scrutiny. *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 102-03 (4th Cir. 2013) (affirming dismissal

under 12(b) of the Free Exercise and RFRA claims, holding that the ACA mandates survived strict scrutiny). Plaintiffs cannot avoid dismissal by merely invoking strict scrutiny.

The cases Plaintiffs cited in brief: *Republican Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir. 1992); *Brown v. District of Columbia*, 390 F. Supp. 3d 114 (D.D.C. 2019); and *Smith v. District of Columbia*, 387 F. Supp. 3d 8 (D.D.C. 2019), do not support their position. Each involved fact-intensive disputes over government motive or discretionary enforcement. None involved a facially neutral statute applying uniform administrative criteria to all applicants. Here, the relevant considerations are apparent on the face of the complaint and exist in the law as set forth in Defendants' memorandum in support and below.

### C. The Statute Is Narrowly Tailored to Serve That Interest

The statutory scheme is carefully designed to achieve the Commonwealth's interest without unnecessarily burdening religious exercise. It provides multiple pathways for individuals to be authorized to solemnize marriages, each with built-in mechanisms of accountability. Section 20-23 allows ministers of any religious denomination to be authorized upon proof of ordination and regular communion with their religious society. This ensures that the officiant is accountable to a recognized religious body that exercises oversight and can verify the minister's status and conduct. As *Cramer* explains, ordination is treated as "a considered, deliberate and responsible act" that provides an "authoritative" vetting of the individual. *Id*.

Section 20-26 allows religious societies without ordained ministers to solemnize marriages "by the persons and in the manner prescribed by and practiced in any such society." One person chosen by the society is responsible for completing the marriage certification and, critically, is required to execute a bond in the penalty of $500, with surety. This provision ensures accountability in two ways: (1) through internal religious governance, as the officiant must be

18

selected by the society according to its established practices; and (2) through a financial bond, which provides a legal mechanism to deter misconduct and ensure compliance with the state's certification requirements. Although no oath is required and the officiant is not considered an officer of the Commonwealth, the bond requirement ensures that the individual is legally accountable for the proper execution of the marriage.

These provisions demonstrate that the Commonwealth's approach is not only inclusive of diverse religious traditions but also narrowly tailored to ensure that those who perform the legal act of marriage solemnization are subject to meaningful oversight, whether by a religious body, a civil court, or a financial surety. The statutes do not prohibit anyone from conducting religious ceremonies or expressing religious beliefs. They regulate only the legal act of solemnization that results in a state-recognized marriage, a civil function with legal consequences.

Moreover, the broader statutory framework includes § 20-25, which provides a court-supervised pathway for individuals who do not qualify under the religious provisions. Under § 20-25, any Virginia resident may petition the circuit court for authorization to solemnize marriages. The statute requires the petitioner to execute a bond and demonstrate residency in the circuit, ensuring accountability to the court and the local community.

This alternative pathway accommodates individuals who are not affiliated with a religious society or whose religious society does not meet the structural requirements of §§ 20-23 or 20-26. Plaintiffs, for example, could have sought authorization under § 20-25, but chose not to. This provision also reinforces the Commonwealth's compelling interest in accountability. Whether through religious oversight (§ 20-23), internal designation and bonding (§ 20-26), or judicial vetting and bonding (§ 20-25), each pathway ensures that the officiant is subject to some form of institutional or legal control.

19

The existence of § 20-25 shows that Virginia's statutory scheme is not a blunt instrument. It is a carefully calibrated system that respects religious diversity, provides secular alternatives, and ensures that the solemnization of marriage, a legal act with civil consequences, is performed by individuals who are competent, accountable, and authorized. This flexibility strongly supports the conclusion that the statutes are narrowly tailored to serve the Commonwealth's compelling interest in the integrity of its marriage laws.

Virginia's interest in ensuring that marriage officiants are "persons of integrity and responsibility" is not speculative; it is judicially recognized. *See Cramer*, 214 Va. at 565-67. The statutory requirements, such as ordination through a deliberate process and regular communion with a religious society, are designed to ensure that officiants are accountable to an institution capable of oversight. This directly supports the state's interest in the proper execution and timely filing of marriage records.

Plaintiffs claim the statute is overbroad because it excludes all ULC ministers, including public figures like Gavin Newsom and Tom Hanks. But the statute does not evaluate individual character; rather it applies uniform criteria to ensure structural accountability. Plaintiffs do not allege that any excluded minister meets the statutory requirements. Their anecdotal examples do not show overbreadth; they show that the statute applies consistently.

Plaintiffs also claim under-inclusiveness by pointing to a minister who remained in her car during a ceremony. But isolated examples of poor officiating do not undermine the statute's tailoring. The state cannot guarantee perfect performance. It can only set reasonable accountability standards. Plaintiffs do not allege that the statute fails to advance the state's interest in a direct and material way.

Finally, Plaintiffs suggest that fines or penalties for noncompliance would be less restrictive. But that alternative addresses enforcement, not eligibility. The state's interest lies in preventing errors before they occur, not merely punishing them afterward. The administrative criteria in §§ 20-23 and 20-26 along with the alternative remedies in § 20-25 are narrowly tailored to that preventive goal.

For these and the additional reasons of record, Defendants request that the Court dismiss the case against them with prejudice and afford them such other and further relief as the case may require.

R. STEVEN LANDES
and
STACI N. FALLS,

By Counsel

By:    /s/   Rosalie Pemberton Fessier
Rosalie Pemberton Fessier
VSB # 39030
Brittany E. Shipley
VSB # 93767
Attorneys for Defendants Landes and Falls
Timberlake**Smith**
25 North Central Avenue
P. O. Box 108
Staunton, VA 24402-0108
phone:  540/885-1517
fax:      540/885-4537
email:  rfessier@timberlakesmith.com
          bshipley@timberlakesmith.com

CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2025, I have electronically filed this document with the Clerk of the Court using the CM/ECF system.

/s/   Rosalie Pemberton Fessier
Rosalie Pemberton Fessier
VSB # 39030
Brittany E. Shipley
VSB # 93767
Attorneys for Defendants Landes and Falls
Timberlake**Smith**
25 North Central Avenue
P. O. Box 108
Staunton, VA 24402-0108
phone:  540/885-1517
fax:      540/885-4537
email:  rfessier@timberlakesmith.com
            bshipley@timberlakesmith.com