IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| UNIVERSAL LIFE CHURCH MONASTAERY STOREHOUSE, et al., <br><br> **Plaintiffs,** <br><br> v. <br><br> R. STEVEN LANDES, et al. <br><br> **Defendants.** | Case No. 5:25-cv-00047 |

**REPLY IN SUPPORT OF COMMONWEALTH ATTORNEY DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO RULE 12(b)(6)**

Defendants, Tim A. Martin and Jeffery Gaines (collectively, the "CA Defendants"), submit this reply in support of their motion to dismiss the complaint for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

I. **Establishment Clause.**

Plaintiffs' response ignores the fact that the challenged statutes pose an administrative requirement, not an ecclesiastical one. Specifically, Plaintiffs refuse to engage with the holding of *Cramer*, in which the Supreme Court of Virginia expressly stated that Code § 20-23 "was not concerned with preferring one sect over another." *Cramer v. Commonwealth*, 214 Va. 561, 565, *cert. denied,* 419 U.S. 875 (1974). Thus, their analysis of support under *Kennedy*'s "historical practices and understandings" test digresses into historical support for not showing preferences for some religious sects over others. *See Kennedy v. Bremerton School District*, 597 U.S. 507, 510 (2022) (internal quotation omitted). The correct history and practice to examine, however, is the history and practices regarding licensing marriage celebrants in Virginia.

In *Cramer*, the Court recognized that Virginia did not appoint "any minister who was itinerant, or not settled within some parish or. . . congregation within the Commonwealth" to

perform marriages. *See id*. at 564. Although the *Cramer* opinion recognized that Code § 20-23 "amounts to a blanket qualification of all ministers selected or elected by religious organizations or societies," the Court held there was no preference of one religious sect over another in Virginia's statutory scheme, which presumes all sects select or elect their ministers in a "considered, deliberate and responsible act." *Id.* at 566. In fact, *Cramer* itself has already held the statute at issue was not unconstitutional as applied to Universal Life Church – and that holding has not been disturbed for fifty years.

Instead of addressing the historical precedent against their argument, Plaintiffs rely heavily on the Supreme Court's recent decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission* to support their claims. 605 U.S. 238 (2025). That case is inapplicable here for two important reasons. First, the Wisconsin statute required the court to distinguish which organizations were engaged in a "religious purpose" sufficient to trigger an exception to the state's unemployment insurance requirement. *Id.* at 241. Accordingly, the Wisconsin Supreme Court applied a two-prong test to determine whether an organization's mission was "primarily for a religious purpose," creating a theological test for which religious organizations had a religious enough purpose to trigger the unemployment insurance exception. *Id.* Second, the Wisconsin statute at issue had no alternative track to allow for the exception to apply regardless of theology.

By contrast, Virginia's statutes do not turn on the theological beliefs of the celebrant or on the church that ordained the celebrant. Instead, they impose different requirements for licensure based on the administrative structure of the ordaining church, if any: did the church use "a considered, deliberate and responsible act" (*see Cramer*, 214 Va. at 564) in ordaining its ministers? If so, is the minister in regular contact with the sanctioning church? When both

conditions are met, Code § 20-23 applies. If not, "a religious society which has no ordained minister" may designate a person who "shall be responsible for completing the certification of marriage in the same manner as a minister or other person authorized to perform marriages." Code § 20-26. Section 20-26 also explicitly states that the ceremony for marriage in those religious societies without an ordained minister "may be solemnized by the persons and in the manner prescribed by and practiced in any such society." Thus, Virginia's statutes provide alternatives for various religious sects, or for marriage celebrants without religious affiliation, unlike the statute in *Catholic Charities*. Virginia's statutes also expressly state that they do not intend to impact the religious rituals of a religious society celebrating a marriage, only provide a pathway to recording the marriage contract with the state.

Indeed, *Cramer* expressly held that Code § 20-23 "was not concerned with preferring one sect over another," *id.* at 566, but was balancing the desire of "the overwhelming majority of the people in this state [who] prefer that their contract of marriage be solemnized, attested and officially reported by a representative of their own religion, faith or religious society," with the state's "necessity that the marriage contract itself be memorialized in writing and by a person of responsibility and integrity and by one possessed of some educational qualifications." *Id.* at 565.

Thus, the requirements of Virginia's marriage celebrant statutes are purely administrative, not theological, and there is no claim to a violation of the Establishment Clause.

## II.     Plaintiffs have failed to state a significant burden on the exercise of their religious beliefs.

Plaintiffs have failed to state how Virginia's statutory scheme poses a substantial burden on their religious practices. They claim that "by preventing them from officiating marriages as ministers" they are unable to engage with "a core component of their religious practice." ECF 32, at 31. But Plaintiffs can officiate weddings as ministers, if they obtain authorization under

3

Code § 20-25. Plaintiffs characterize this alternative as requiring them "to disavow the legitimacy of their ordination." ECF 32, at 31. This claim is directly contrary to the statutory language of Code § 20-25, which expressly states that "No oath shall be required of a person authorized to celebrate the rites of marriage." Thus, there is no requirement to disavow their religious beliefs or their ordination. Instead, the authorization under § 20-25 simply ensures that some authority has reviewed the marriage celebrant's ability to accurately and timely complete the certification of marriage. Even the refundable bond requirement may be waived if the applicant can certify financial hardship. *Id.*

Plaintiffs fail to explain why certification pursuant to § 20-25 is a substantial burden on their religious practices but certification pursuant to § 20-23 is not. Even in the case cited by Plaintiffs, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, the Supreme Court only counseled "neutrality" and "tolerance" toward a person's religious beliefs, when evaluating government regulations that may impose a burden on religious exercise. 584 U.S. 617, 638 (2018). In *Masterpiece Cakeshop*, the Court once again urged courts to rely on "the historical background of the decision under challenge," to determine if the challenged statute or regulation is "neither tolerant nor respectful" of the plaintiff's religious beliefs, which would support a claim that the regulation is intended to unconstitutionally burden a person's religious practice. *Id.* at 639.

Plaintiffs claim that becoming certified to celebrate marriages in Virginia under Code § 20-25 is an unconstitutional burden on their religious beliefs when licensure pursuant to Code § 20-23 is not. *See* ECF 32, at 20. They claim that being licensed by the circuit court instead of being able to avail themselves of the licensure track available to ordained ministers is "an official judgment about an ecclesiastical matter" rather than simply an administrative distinction. *Id.*

4

Yet there is no support for finding Code § 20-25 imposes an unconstitutional burden on the Plaintiffs' religious practice because the distinction is supported by the history behind the statutes. Virginia's marriage licensing scheme has a long history, as set forth in the Defendants' opening briefs. *See* ECF 25, at 10-12; ECF 27, at 11-12. Over time, the statutes have only liberalized who may celebrate marriages, by recognizing ministers from non-Christian churches and lowering the bond requirement. Rather than reflecting hostility toward non-majority religions, Virginia has long permitted marriage celebrants to post a bond to become eligible to solemnize a marriage, if they were not part of an established congregation. George W. Munford, *Third Edition of the Code of Virginia: Including Legislation to January 1, 1874*, 843 (Richmond, James E. Goode 1873) (Tit. 31, ch. 104). The alternative methods to become licensed to solemnize weddings reflect a historical trend toward accommodating various faith traditions, including the Quakers who do not have ordained ministers, rather than a desire to discriminate against them or exclude them. *Id.*

Thus, unlike the statute analyzed in *Masterpiece Cakeshop*, there is no historical support for the Plaintiffs' subjective feeling that licensure under Code § 20-25 reflects a discriminatory animus toward the Plaintiffs' beliefs. Therefore, Plaintiffs have failed to show an actual substantial burden on their religious practice or that Virginia's neutral statutory scheme was created out of an invidious animus toward Plaintiffs' religion. Without such a showing, they have failed to state a claim for violation of their Free Exercise rights.

**III.    Plaintiffs have failed to state an Equal Protection violation.**

Plaintiffs attempt to bolster their failing Equal Protection claim by wildly mischaracterizing both the facts and the holding of *In re: Application of Ginsburg*, 236 Va. 165 (1988). First, Plaintiffs are not "similarly situated" to the applicant in *Ginsburg*. In *Ginsburg*, the

5

"Clerk" of a Quaker Meeting applied "for authority to celebrate marriages under Code § 20-23," because Quakers have no designated minister. *Id.* at 166. Instead, the Quaker congregation elected Ginsburg to be the Clerk of their Meeting, which is the "designated administrative official." *Id.* The Clerk is "the sole incumbent of that position." *Id.* Ginsburg, as Clerk, "meets with the members of the Meeting for weekly worship" and performs ministerial duties for the congregation. *Id.* Accordingly, by virtue of his election by the congregation who entrusted Ginsburg with the authority to perform ministerial tasks for the Meeting and his regular communion with the congregation, the Court held that Ginsburg met the requirements of an ordained "minister" within the meaning of Code § 20-23 and did not have to post the bond required by Code § 20-26 for sects without an ordained minister.

Plaintiffs are in no way similarly situated to Ginsburg for the purposes of meeting the requirements of Code § 20-23. They admit they were self-selected as ministers, not elected or appointed by an ecclesiastical body. ECF 1, ¶¶ 40, 56. They admit that one tenet of the ULC Monastery is that it will ordain anyone who feels called, without limitation or qualification. ECF 1, ¶ 20. Plaintiffs do not perform any ministerial tasks for their respective churches. They do not allege any experience with administration or ministerial tasks, unlike the applicant in *Ginsburg*. And they do not allege weekly meetings with their faith community. On the contrary, they repeatedly allege that their "regular communion" with their church is "*not* limited to traditional formats such as delivering weekly sermons, at particular locations, to certain bodies of congregants." ECF 1, ¶ 21 (emphasis added). Although Plaintiffs listed a number of ways Plaintiff ULC Monastery Storehouse maintains contact with those ordained ministers who choose to avail themselves of the ULC's online communications, ECF 1, ¶ 26, there are no

6

allegations that Plaintiffs Shorts or Davis engage in those online communities or read the newsletters.

Thus, Plaintiffs' claim that the disparate treatment of ULC ministers compared to the treatment of a Quaker Clerk is not evidence of discrimination on the basis of religion. Instead, it is disparate treatment due to the fact that Plaintiffs failed to meet the statutory criteria of § 20-23 when a Quaker Clerk was able to successfully show that he did. *In re: Application of Ginsburg* is an example of how Virginia's statutes do not look at a particular set of religious beliefs but instead examine the applicant's qualifications to serve as an administrative official, including election by the community the applicant seeks to serve.

### IV.   Plaintiffs' own arguments demonstrate they do not have a Free Speech claim.

#### a.   There is no regulation of Plaintiffs' expressive speech or conduct.

Plaintiffs tie their Free Speech claim to the fact that weddings involve "expressive and symbolic choices . . . such as the selection of readings and speakers, contents of sermons and vows, performances of rituals like ring exchanges, and design of the altar." ECF 32, at 35. But Virginia's statutes do not regulate any of those expressive choices. They only regulate who may file the certificate of marriage and certify the facts of the marriage. *Cramer*, 214 Va. at 565.

Nor can Plaintiffs credibly claim that they can only be certified to celebrate marriages if they "associat[e] with the government's preferred religious societies." ECF 32, at 35. Plaintiffs all but concede they could become licensed pursuant to § 20-25. They simply do not want to, because of the "non-trivial financial burden" of the refundable $500 bond (which may be waived for inability to pay pursuant to Code § 20-25) and because it would be "a second-class government-issued permission slip." Compl., ¶ 45. Yet Plaintiffs do not resolve this objection with certification pursuant to Code § 20-23, which is also a "government-issued permission slip"

7

based on ordination by election or appointment and regular communion with the ordaining church. The only difference that makes the license issued pursuant to § 20-25 "second-class" to the one issued pursuant to § 20-23 is the requirement of the refundable bond. Interestingly, although Plaintiffs claim that licensure pursuant to § 20-25 "repudiate[s] the legitimacy of [their] ordination," they are willing to accept licensure pursuant to § 20-26. ECF 1, ¶ 99(b.). Yet § 20-26 applies to religious societies with "no ordained minister," which on its face seems to expressly invalidate the Plaintiffs' ordination as ministers of the ULC Monastery.

Plaintiffs also claim that Virginia would restrict licensure to those who do not believe that ordination online is "valid and sacred" or that a minister may not "be in regular communion with a religious society in nontraditional ways." ECF 32, at 36. Nothing in the challenged statutes, however, restricts the use of the internet or other non-traditional media to conduct the vote for ordination or as a tool for ministry. Virginia's statutes would not prevent a minister who used these nontraditional methods to reach their congregation from performing weddings, nor have Plaintiffs cited to any authority to support this claim. In fact, Shorts and Davis have not claimed to use any methods at all to regularly commune with a congregation. There is no evidence they were rejected because of nontraditional communion methods, rather than the lack of any regular communion with their church community at all.

Similarly, ULC's ordination process fails to pass statutory muster because the ULC imposes no criteria whatsoever on its ministers, not because ordination occurred via website. Indeed, in 1974 the Supreme Court of Virginia found ULC's ordination process failed the statutory requirements even though ordination happened either at the ULC offices in California or via another ULC minister. *Cramer*, 214 Va. at 562. It is the lack of a considered, deliberative process in ordination that is material, not the medium. *Id.* at 565-66. Thus there is no Free

Speech claim. Virginia is not regulating a belief system or a message. It is regulating who is qualified to return a certificate of marriage accurately and timely.

Plaintiffs argue that a facially neutral law is presumptively unconstitutional and subject to strict scrutiny when the enforcement of the law "cannot be justified without reference to the content of the regulated speech." ECF 32, at 36 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015)). But this point only bolsters Defendants' argument. The determination that Plaintiffs have not met the licensure requirements to officiate marriages under Code § 20-23 or § 20-26 contains no referral, nor need it refer, to the content of Plaintiffs' message. There is no reference to Plaintiffs' proposed marriage ceremonies or rituals. There is no reference to Plaintiffs' belief in the sanctity of online ordination or nontraditional church communion with its congregation. Instead, the challenged statutes merely concern whether a person was elected or appointed as the head of a church or other religious society and whether they are in regular communication with their religious society, such that the state may ensure the minister is a reliable person to complete and file a certificate of marriage, a crucial public record. *Cramer*, 214 Va. at 565. A minister in regular communion with the religious order he serves is accountable to that community for any failure to perform the duties required. It is that accessibility and accountability that is material to the state's interest, not the content of communications among church members and their minister.

Therefore, Plaintiffs have failed to state a claim for violation of their Free Speech rights. It is not the content of their message that matters, but the conduct by which they were selected as the head of a religious sect or organization and their regularly mutual communication with the other members of that sect that ensures they are a suitable person to perform marriages in Virginia pursuant to Code § 20-23 rather than § 20-25.

## V. The statutes can pass even strict scrutiny.

Even if the Plaintiffs could demonstrate that the challenged statutes burdened their religious freedom or regulated the content of their speech, the statutes are narrowly tailored and serve a compelling government interest as a matter of law. *See Cramer*, 214 Va. at 567. In *Cramer*, the Court recognized the compelling interest the State has in ensuring that marriage certificates have a certification of the facts of the marriage and that the license is returned within five days after the ceremony. *Id.* (citing repealed statute Code § 32-353.34 which has been recodified with a similar material directive as Code § 32.1-267). The Court held that "the same paramount and compelling state interest which appellants admit existed in 1794 exists today." *Id.*

Accordingly, Virginia requires that marriage celebrants be vetted by their congregations or churches, Code §§ 20-23, 20-26, or they can be sanctioned by a circuit court, § 20-25. Nothing in the statutes suggests that a ULC Monastery minister is not of sufficient integrity or responsibility to act as an officiant as Plaintiffs claim. ECF 32, at 27. Rather it is simply that the process by which the ULC Monastery ordains its ministers is insufficient to ensure the person that was ordained is "honest, literate, and fairly trustworthy." *Cramer*, 214 Va. at 567. On the contrary, one of its few tenets is that the ULC Monastery will ordain anyone who feels "called to ministry," without any other stated qualification or limitation. ECF 1, ¶ 2. This process does not ensure that those ordained are literate, trustworthy, or punctual with returning completed certifications of marriage as required by statute.

Plaintiffs argue that those certified to officiate weddings and return the requisite paperwork are not "more responsible" or "marked by greater character" than ULC Monastery ministers. ECF 32, at 39. Plaintiffs cite to the fact that one licensed civil celebrant would not get out of her car in order to certify the marriage. *Id.* This is a red herring. Nothing in Plaintiff's

10

anecdote about her mother's wedding suggests the civil officiant did not certify the facts of the wedding accurately or that she failed to return the certificate within five days as required. This only emphasizes that the qualifications are secular and practical, not theological or moral.

Plaintiffs also suggest the law is not narrowly tailored, because Virginia could simply fine ministers who fail to file the documents as required. ECF 32, at 39. But Virginia *does* fine ministers who do not comply with the certification requirements. *See* Code § 20-24. An after-the-fact penalty, however, will not cure problems with accurate performance of the duties of the officiant that are not discovered until years later.

Plaintiffs simply cannot show how the process of being certified by a circuit court unconstitutionally burdens their religious expression in light of the compelling state interest in ensuring that marriage officiants are minimally competent to perform the task of certifying a wedding. Therefore, the statutes at issue are constitutional as a matter of law even under a strict scrutiny standard and this case may be properly dismissed.

**Respectfully submitted,**

Jason S. Miyares
Attorney General

Thomas J. Sanford
Deputy Attorney General

Jacqueline C. Hedblom
Senior Assistant Attorney General/
Trial Section Chief

Calvin C. Brown
Senior Assistant Attorney General/Unit Manager

/s/ Erin R. McNeill_____
Virginia Bar Number: 78816
Senior Assistant Attorney General
Stanley W. Hammer (VSB No. 82181)*
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0598
Fax: (804) 371-2087
E-mail: emcneill@oag.state.va.us

11

## CERTIFICATE OF SERVICE

      I hereby certify that on August 18, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

      /s/ Erin McNeill_____
      Virginia Bar Number: 78816
      Senior Assistant Attorney General