CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
February 11, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| Universal Life Church Monastery Storehouse *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:25-cv-00047 |
| | ) | |
| R. Steven Landes *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

In Virginia, aspiring marriage officiants must receive authorization from the Commonwealth before they have the legal power to solemnize a marriage. The statutory framework governing marriage officiants has stood for almost a century and has been upheld unequivocally by the Virginia Supreme Court. Universal Life Church Monastery, a non-denominational organization well known for offering online ordination to all members, and two of its ministers bring this suit. They ask this court to declare that the City of Staunton and the Augusta County Circuit Court Clerks of Court and Commonwealth Attorneys violated the First and Fourteenth Amendments of the U.S. Constitution. They maintain that the Clerks' denial of their requests for authorization to officiate a marriage under the relevant statutes is unconstitutional. The court disagrees. Because Universal Life Church Monastery and its ministers lack standing to bring their claims against these local officials, this court will grant Defendants' motions to dismiss for lack of subject matter jurisdiction. (Dkts. 26, 30.)

# I.    Background[1]

Universal Life Church Monastery ("ULC" or "the Church") is a "non-denominational religious organization that champions religious freedom, social justice, and diverse forms of spiritual expression." (Compl. ¶ 2 (Dkt. 1).)  The Church "ordains all who feel called to serve [as ministers] . . . at no cost through an online process." (*Id.* ¶ 20.)  The Church allows "anyone who affiliates" with it to become ministers through this online process.  (*Id.*)  This online ordination process reflects the Church's "theological conviction that spiritual authority is not conferred by human institutions but recognized through individual conscience and divine inspiration." (*Id.* ¶ 23.)

Ministers are expected to follow the Church's core tenets: to "strive to do only that which is right" and to "practice their religion in the manner of their choosing . . . so long as that expression is lawful and does not infringe on the rights of others." (*Id.* ¶¶ 18, 21.)  As long as ministers follow those two directives, they may "maintain good standing and regular communion with the Church." (*Id.* ¶ 21.)  "[T]raditional formats" of communion with the Church, like weekly sermons to congregants, are not required by the Church.  (*Id.*)  Ministers can interact with each other and with the public through the Church's private social network, blog, and public discussion forum.  (*Id.* ¶ 26.)  The Church provides its ministers with "credentials, spiritual texts, and pastoral guidance" by mail and offers "commentary on the role of faith in contemporary society" through its weekly newsletter.  (*Id.* ¶¶ 20, 26–27.)

---

[1] The facts are taken from Plaintiffs' complaint and are accepted as true when addressing a motion to dismiss. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

In Virginia, couples must obtain a marriage license before marrying.  (*Id.* ¶ 32 (citing Va. Code Ann. § 20-13).)  These licenses are generally issued by the clerks of city or county circuit courts and are issued along with two marriage certificates.  (*Id.* ¶¶ 32, 34 (citing Va. Code Ann. §§ 20-14, 20-16).)  The wedding officiant is charged with "certify[ing] to the facts of marriage" and with completing and returning the marriage certificates to the issuing clerk, who is then responsible for recording the certificates.  (*Id.* ¶¶ 32, 34 (citing Va. Code Ann. §§ 20-14, 20-16, 32.1-267).)  By law, the clerks have discretion to assess whether an individual qualifies as an authorized officiant.  (*Id.* ¶ 35.)

Virginia law gives state courts, via their judges or clerks, discretion to authorize these aspiring officiants under one of three different subsections.  (*Id.* ¶¶ 29–31.)  The first, Virginia Code § 20-23, gives the court the option to authorize a "minister of any religious denomination" who produces "proof of his ordination and of his being in regular communion with the religious society of which he is a reputed member."  (*Id.* ¶ 29 (quoting Va. Code Ann. § 20-23).)  The second, Virginia Code § 20-26, gives the court the option to authorize "[o]ne person chosen by" the religious society that the couple to be married belongs to if that religious society "has no ordained minister."  (Compl. ¶ 30 (quoting Va. Code Ann. § 20-26).)  The third, Virginia Code § 20-25, gives any circuit court judge the option to authorize "one or more persons resident in the circuit in which the judge sits" to officiate a particular marriage.[2] (Compl. ¶ 31 (quoting Va. Code Ann. § 20-25).)  This option is available to residents that otherwise may not qualify for authorization under the other two subsections.  (Compl. ¶ 31.)

---

[2] This subsection also provides that certain public officials, such as current and former judges, legislators, statewide elected officers, and state court clerks may solemnize marriages without a court order or bond, provided they are residents of Virginia.  (Compl. ¶ 31 (citing Va. Code Ann. § 20-25).)

Sections 20-25 and 20-26 require the officiant to execute a bond of $500, subject to exceptions. (*Id.* ¶¶ 30–31.)

Virginia Code § 20-28 makes it a Class 1 misdemeanor offense, punishable by up to one year of imprisonment and a fine up to $500, to knowingly officiate a marriage without being authorized by law to do so. (*Id.* ¶ 36.) Commonwealth attorneys have the authority to enforce this subsection. (*Id.* ¶¶ 11, 13.)

Plaintiff Reverend Jaylen N. Shorts is an ordained minister of the Church residing in Staunton, Virginia. (*Id.* ¶ 37.) Motivated to explore "paths to meaningful ordination" when her mother asked her to officiate her wedding, Shorts was drawn to the Church after hearing about it from a trusted coworker. (*Id.* ¶ 39.) She wanted to "honor [her mother's] request in a way that reflected her values," and was encouraged by the Church's "affirmation of spiritual autonomy and its open embrace of LGBTQ individuals." (*Id.*) Hoping to officiate her mother's wedding the following January, Shorts completed the online ordination process in November 2024. (*Id.* ¶¶ 39–40.) She received her credentials, materials, and the first installment of the weekly newsletter from the Church, and she began spreading word in her community that she was "available as an ordained spiritual counselor and minister." (*Id.* ¶ 40.)

When Shorts and her mother contacted the Augusta County Circuit Court Clerk's Office in late December 2024, Defendant R. Steven Landes—the Clerk of Court—told her that his office does "not recognize anyone affiliated with the 'Universal Life Church' or any other online ordination certifications, as being authorized to perform marriages." (*Id.* ¶¶ 10, 41.) Landes advised Shorts to instead seek authorization under § 20-25 or use an officiant from a state-approved list provided by the clerk's office. (*Id.* ¶ 42.) When reached by Shorts's

counsel in early January 2025, Landes again advised that his office would use its discretion to deny Shorts authorization under § 20-23 or § 20-26 because ULC ministers did not qualify for authorization under those subsections. (*Id.* ¶¶ 43–44.) In support, Landes cited an Opinion from the Virginia Attorney General that concluded that precedent set by the Virginia Supreme Court in *Cramer v. Commonwealth*, 202 S.E.2d 911 (Va. 1974), justified denying a ULC minister authorization under § 20-23. (*Id.* ¶ 43.)

Shorts chose not to pursue authorization under § 20-25. (*Id.* ¶ 45.) She was "unwilling to seek secular approval for something she understood to be a spiritual act," and felt that authorization under § 20-25 was a "second-class government-issued permission slip" that "repudiated the legitimacy of her ordination." (*Id.*) Also, she considered the $500 bond to be a "non-trivial financial burden." (*Id.*) Finally, she sought long-term authorization to officiate and felt that such a "one-time civil authorization [under § 20-25] would not permit" her to "serv[e] her community as an ordained religious minister beyond just this one ceremony." (*Id.*) After being unable to receive authorization under § 20-23 or § 20-26 and choosing not to pursue authorization under § 20-25, Shorts felt "both heartbroken and sidelined in her spiritual vocation." (*Id.* ¶ 46.) Her family chose an officiant from the approved government list for her mother's wedding, who officiated the wedding while remaining in the car and "reading aloud from a script." (*Id.* ¶ 47.) Shorts notes this "impersonal" and "detached" service "added insult to injury." (*Id.*)

Ever since Landes denied her authorization under § 20-23 and § 20-26, Shorts has received multiple requests from friends, coworkers, and customers at work to officiate their weddings. (*Id.* ¶ 48.) But she has been "forced to decline" those requests due to "her uncertain

legal authority" and fears of prosecution under Virginia Code § 20-28, which she understands Defendant Tim A. Martin—the Commonwealth Attorney for Augusta County—is "obligated" to enforce. (*Id.* ¶¶ 11, 48–49.) Shorts still "hopes to become a go-to officiant" for her community but claims she has been "barr[ed]" by Defendants from officiating weddings "in accordance with her religious convictions." (*Id.* ¶¶ 50, 52.)

Plaintiff Reverend Michael E. Davis is an ordained minister of the Church also residing in Staunton, Virginia. (*Id.* ¶ 53.) Davis "considers it part of his calling to officiate weddings, baptisms, [and] funerals, and to preach 'the Word.'" (*Id.* ¶ 54.) After pursuing a spiritual journey as a parishioner and eventually as a deacon at the Mount Salem Baptist Church, Davis found ULC on Facebook. (*Id.* ¶¶ 55–56.) Feeling "divinely inspired to begin his own ministry through the Church," Davis completed the online ordination process to become a ULC minister in September 2024. (*Id.* ¶ 56.) Since his online ordination, Davis has been invited to lead worship in his capacity as a ULC minister, and he began focusing more on his own personal ministry through the Church. (*Id.* ¶ 57.) Davis was moved when his son asked him to officiate his wedding, and he promptly began to take the necessary steps to prepare. (*Id.* ¶¶ 58–59.)

In early October 2024, Davis went to the Augusta County Circuit Court Clerk's Office and sought authorization to officiate his son's wedding. (*Id.* ¶ 59.) Like Shorts, Davis was told that he could not receive authorization under § 20-23 as a ULC minister. (*Id.*) Undeterred, Davis went to the City of Staunton Circuit Court Clerk's Office later that month. (*Id.*) The clerks there, who report to the Clerk of Court, Defendant Staci N. Falls, advised Davis that

he could not receive authorization under § 20-23 or § 20-26, and that if he wanted to officiate, he could seek authorization under § 20-25.  (*Id.*)

Davis declined to seek authorization under § 20-25.  (*Id.* ¶ 60.)  He felt that receiving "secular approval" under § 20-25 would diminish his "sincere religious calling" by "stripping it of its sacred meaning."  (*Id.*)  Davis's son postponed his wedding to September 2025, hoping that Davis would "be able to officiate in his capacity as a ULC Monastery minister, not a civil celebrant."  (*Id.* ¶ 61.)  Davis had to decline another request to officiate another wedding in June 2025, leaving him "feeling stifled, demoralized, and inferior."  (*Id.* ¶ 62.)  He understands that he would be "expose[d] [] to criminal penalties enforceable by" Martin and Staunton Commonwealth Attorney, Defendant Jeffrey Gaines, if he solemnized a wedding without official authorization.  (*Id.* ¶¶ 13, 63.)  Davis wishes to officiate weddings in Augusta County and the City of Staunton "consistent with his and the Church's religious tenets," but feels Landes's and Falls's "discriminatory interpretation and application of Virginia law" prevents him from doing so.  (*Id.* ¶¶ 63–64.)

Plaintiffs Shorts and Davis ("the Minister Plaintiffs") and the Church brought this suit on May 22, 2025.  (Compl.)  On July 14, 2025, Defendants Gaines and Martin ("the Attorneys" or "the Attorney Defendants") filed motions to dismiss for failure to state a claim, (Dkt. 24), and lack of subject matter jurisdiction, (Dkt. 30).  On the same day, Defendants Landes and Falls ("the Clerks" or "the Clerk Defendants") filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim.  (Dkt. 26.)  Plaintiffs responded two weeks later, (Pls.' Cons. Opp. to Defs.' Mots. (Dkt. 32) [hereinafter "Pls.' Resp."]), and Defendants filed

- 7 -

their replies one week after that, (Dkt. 33; Defs.' Reply Mem. in Supp. Mot. to Dismiss Pursuant to Rule 12(b)(1) (Dkt. 34) [hereinafter "Attorney Defs.' Reply"]; Dkt. 35.)

## II.    Standard of Review

Challenges to subject matter jurisdiction brought under Federal Rule of Civil Procedure 12(b)(1) may take one of two forms: (1) a facial challenge, which asserts the "complaint simply fails to allege facts upon which subject matter jurisdiction can be based"; or (2) a factual challenge, which asserts "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). When a defendant raises a facial challenge to subject matter jurisdiction, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

## III.    Analysis

This issue in this case finds its roots in the Virginia Supreme Court's interpretation of Virginia Code § 20-23 in *Cramer v. Commonwealth*, 202 S.E.2d 911 (Va. 1974). In *Cramer*, ministers of Universal Life Church appealed after their authorization to solemnize marriages under § 20-23 was rescinded. *Id.* at 912. The Virginia Supreme Court issued three relevant key holdings.

First, it held that § 20-23 was a secular statute, finding that it did not "require[] the courts of Virginia to enforce a religious test as a prerequisite to appointing ministers to perform marriages in Virginia." *Id.* at 913. The case, according to the Court, was "not one concerning the guarantee of religious freedom as provided in the Constitution," but one of

the "proper construction of amended Code [§] 20-23 as an exercise by the General Assembly of its legislative power to delegate the authority to celebrate marriages and to provide licensing requirements for all persons who desire such authority." *Id.* at 914. Noting that the "state has no official interest in the place where a marriage occurs, or in the ceremony or ritual which surrounds the act," the Court emphasized that "[n]either the word 'ordination' nor 'communion' is used [in § 20-23] in an ecclesiastical sense for the legislature was not concerned with the religious aspect of the marriage ceremony." *Id.* The statute, the Court explained, "was not concerned with preferring one sect over another," and in fact was a "blanket qualification of all ministers selected or elected by religious organizations and societies." *Id.* at 915. The key, though, was that "such a selection or election must be a considered, deliberate, and responsible act," since "[o]rdination is the ultimate in the selection process." *Id.*

Next, it held that a state legislature can properly "require that the person who performs a marriage ceremony be certified or licensed." *Id.* at 914. The Court explained that the statute furthers the state's interest "not only in marriage as an institution, but in the contract between the parties who marry, and in the proper memorializing of the entry into, and execution of, such a contract." *Id.*

Finally, the Court found that Universal Life Church—a "church which consists of all ministers, and in which all new converts can become instant ministers"—"in fact has no 'minister' within the contemplation of [§] 20-23." *Id.* at 915. Section 20-23 requires, according to the Court, that a "minister" be "the person *elected* or *selected* in in accordance with the ritual, bylaws, or discipline of the order." *Id.* (emphasis added). The Court stressed that it did "not

believe that the [legislature] ever intended to qualify, for licensing to marry, a minister whose title and status could be so casually and cavalierly acquired." *Id.*

The court does not disturb *Cramer*'s interpretation of § 20-23 here. "When a state's highest court interprets a statute, [federal courts] are bound by the state court's interpretation, and must assume that the statute says what the state courts say it says." *Landholt v. Corley*, 149 F.4th 486, 490 (4th Cir. 2025) (cleaned up). *Cramer* clearly holds that § 20-23 is a secular statute, and that the determination of whether an aspiring officiant meets the criteria in § 20-23 is not a religious one. *See* 202 S.E.2d at 913–14. With that in mind, the court will turn to whether Plaintiffs have standing to bring their constitutional claims against the Defendants.

Under Article III of the U.S. Constitution, a federal court may exercise subject matter jurisdiction only over "cases" and "controversies." U.S. Const. Art. III, § 2; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). "Embedded in this limitation is a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560) (cleaned up). "Federal courts are required to ensure that they have jurisdiction and must address standing problems even when parties do not raise them." *Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 565–66 (4th Cir. 2024).

To establish Article III standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Both individual and organizational plaintiffs must satisfy the standing requirement. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). And plaintiffs

must "demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Est., Inc.*, 581 U.S. 433, 439 (2017). The court will first address the Minister Plaintiffs' individual standing before turning to the Church's organizational standing.

## A. Individual Standing

### 1. Injury in Fact

The Minister Plaintiffs seek declaratory and injunctive relief against both the Clerk Defendants and the Attorney Defendants. (Compl. ¶ 99.) They assert injuries based on the Clerk Defendants' conduct and on the threat of prosecution from the Attorney Defendants. Accordingly, the court will analyze the alleged injuries in fact separately.

#### a. *Clerk Defendants*

Shorts and Davis allege injuries stemming from the Clerk Defendants' "policy and actual practice of denying recognition to ULC Monastery ministers under Va. Code Ann. §§ 20-23 and 20-26." (Compl. ¶ 16.) They claim that the Clerk Defendants' "discriminatory enforcement" of state law has caused several constitutional injuries: it chilled their speech, burdened their religious practice, and denied them equal treatment as religious ministers. (*See, e.g., id.* ¶¶ 51–52, 64, 69, 72, 77, 85, 95.)

To satisfy the injury in fact prong, Plaintiffs must show injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Long v. Bondi*, 151 F.4th 503, 515 (4th Cir. 2025) (quoting *Lujan*, 504 U.S. at 560). At this stage and for this inquiry, the court must accept Plaintiffs' characterizations of their injuries as true. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016); *see also Rogers v. U.S. Dep't Health & Hum. Servs.*,

466 F. Supp. 3d 625, 641 (D.S.C. 2020) (noting "the court must accept Plaintiffs' characterization of their injuries" when analyzing injury in fact at the motion to dismiss stage). Plaintiffs allege that the Clerks intruded upon their First Amendment rights by refusing to authorize them under § 20-23 or § 20-26, causing "stigmatic" injuries, burdening Plaintiffs' religious exercise, and chilling their expressive activity. (*See* Pls.' Resp. at 7–8.)

The injury-in-fact showing for First Amendment cases is lenient at the motion to dismiss stage, but it still requires plaintiffs to plead a plausible cognizable injury that is actual and ongoing. *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 211–212 (4th Cir. 2017). In addition, plaintiffs must satisfy one of two threshold showings.

First, Plaintiffs could show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Am. Fed'n of Gov't Emps. v. Off. Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021) (quoting *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018)). Here, Plaintiffs sufficiently allege a constitutional interest in free speech and free exercise but fail to allege how these interests are proscribed by a statute. Virginia Code §§ 20-23 and 20-26 grant certain state officials the power to issue orders that authorize certain persons to celebrate marriages in Virginia. Those sections do not proscribe any conduct. Virginia Code § 20-28 proscribes celebrating a marriage without proper authorization but does not proscribe Plaintiffs' intended course of conduct, which is to celebrate marriages in their Virginia communities consistent with their religious beliefs. (*See, e.g.*, Compl. ¶¶ 50, 65.)

Second, Plaintiffs can establish injury in fact with a "sufficient showing of self-censorship which occurs when a claimant is chilled from exercising his right to free

expression." *Am. Fed'n of Gov't Emps.*, 1 F.4th at 187 (quoting *Kenny*, 885 F.3d at 288). The alleged chilling effect must be objectively reasonable, and government action will be sufficiently chilling when it is "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)) (cleaned up). Plaintiffs fail to show that their self-censorship was objectively reasonable because they could still officiate weddings consistent with their religious beliefs by receiving authorization under Virginia Code § 20-25.

At bottom, Plaintiffs' injury comes from their own decision not to pursue authorization under § 20-25. Plaintiffs allege no facts to suggest that they would be denied authorization to celebrate marriages under § 20-25. And if they received such authorization, they could celebrate weddings in the City of Staunton and Augusta County as they wished—none of their religious or expressive activity would be burdened. Injuries in fact must be "credible," *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013), and cannot be "self-inflicted," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013). The court cannot find injury in fact here, as the harm is caused by the Minister Plaintiffs' own voluntary decisions. (*See* Compl. ¶ 45 ("Rev. Shorts chose not to pursue the temporary civil authorization."); *id.* ¶ 60 ("Rev. Davis declined to seek civil authorization.").)

Shorts and Davis attempt to justify their decision to self-censor by making a false distinction. Shorts claims, for example, that she "was unwilling to seek secular approval [under § 20-25] for something she understood to be a spiritual act," and Davis claims that authorization under § 20-25 would "strip[]" his religious calling "of sacred meaning." (*Id.*

¶¶ 45, 60.)   While officiating a wedding may very well be a "spiritual act" for minsters, authorization orders from the court under § 20-23, -25, and -26 are *all* "secular" approvals. Virginia courts and their officers are not religious officials, hence all marriage authorizations they issue are purely administrative.   Plaintiffs claim that there is some "religious" versus "secular" distinction in the authorization orders.   The court is not convinced.   The clerks do not perform a "religious test" when deciding whether a person is authorized under § 20-23. *Cramer*, 202 S.E.2d at 913.   Authorization under § 20-23 or § 20-26 is not a "necessary prerequisite to *any* form of the expressive activity [Plaintiffs] wish[] to undertake." *See Benham*, 635 F.3d at 136.   Accordingly, the Clerk Defendants' actions cannot be said to "deter a person of ordinary firmness from the exercise of First Amendment rights," and Plaintiffs' alleged chilling effect is not objectively reasonable. *See id.* at 135 (citation omitted).   Because Plaintiffs' intended course of conduct is not proscribed by any statute, and their alleged chilling effect is not objectively reasonable, the court finds that the ministers have not shown injury in fact as to their First Amendment claims against the Clerk Defendants.

Plaintiffs' Equal Protection claim fares no better.   Plaintiffs bringing Equal Protection claims can show injury in fact by alleging a "denial of equal treatment resulting from the imposition of [a] barrier" by the government. *Hierholzer v. Guzman*, 125 F.4th 104, 113 (4th Cir. 2025).   Plaintiffs need not show "the ultimate inability to obtain the benefit," *id.* (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)), but they must show that "some discriminatory classification" prevented them from "competing on equal footing in its quest for a benefit," *City of Jacksonville*, 508 U.S. at 667. Plaintiffs are unable to make such a showing.

Plaintiffs assert that the Clerks' refusal to authorize the ULC ministers under § 20-23 or § 20-26 "treats the Church and its ministers unequally and denies them [the] benefit" of officiating weddings on equal terms with other religious organizations and ministers. (Pls.' Resp. at 8; *see* Compl. ¶¶ 4, 37, 44, 61, 64, 85.) This discriminatory refusal, according to Plaintiffs, is based on the ministers' religious beliefs and status as Universal Life Church ministers. (Compl. ¶ 85, Pls.' Resp. at 25.)

As discussed above, the Clerks' advisements that Plaintiffs do not qualify for authorization under §§ 20-23 or -26 are not related to the ministers' religious beliefs. They only relate to the ministers' affiliation with the Church insofar as the Church's well-known online ordination procedure does not fit § 20-23's non-ecclesiastical definition of "ordination" as interpreted by *Cramer* to mean a "considered, deliberate, and responsible act." 202 S.E.2d at 915. Sections 20-23 and 20-26 do not classify by religious organization. Under the statutes, each individual—no matter his religious affiliation—must offer their own "proof of his ordination and of his being in regular communion with [his] religious society" (for § 20-23) or show that they were the "[o]ne person chosen by" their religious society to perform marriages (for § 20-26) to obtain authorization. *Id.* at 563, 568 (quoting Va. Code Ann. §§ 20-23, 20-26).

Plaintiffs are correct that "[a] law that differentiates between religions along theological lines is textbook denominational discrimination." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 248 (2025). But the words "ordination" and "communion" in § 20-23 are not used "in an ecclesiastical sense for the legislature was not concerned with the religious aspect of the ceremony." *Cramer*, 202 S.E.2d at 914. Unlike the Wisconsin statute in *Catholic Charities*, the Virginia statues here do not "establish a preference for certain religions

based on the content of their religious doctrine." 605 U.S. at 248. The *Catholic Charities* court distinguished the Wisconsin statute, which "turn[ed] on inherently religious choices" from statutes that differentiate on "secular criteria that happen to have a disparate impact upon different religious organizations." *See id.* at 250 (quoting *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982)) (cleaned up). The Virginia statutes, at most, fall into the latter category. Accordingly, Plaintiffs have not shown a "discriminatory classification" in the statutes at issue. *See City of Jacksonville*, 508 U.S. 656 at 667.

Plaintiffs next contend they suffered injury from not being able to officiate weddings "on equal terms as other religious ministers ordained by preferred religious societies." (Compl. ¶ 61.) But Plaintiffs do not allege any ministers who are similarly situated to them and were given authorization under §§ 20-23 or -26. *See Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92, 102 (4th Cir. 2023) ("[T]o present an equal terms claim, a plaintiff must propose a comparator that is similarly situated with regard to the ordinance at issue." (cleaned up)). Plaintiffs do not show any other ministers that received authorization under the statutes despite showing ordination procedures or methods of being in regular communion with their society similar to those of ULC ministers. *See* Va. Code Ann. § 20-23 (requiring a minister "of any religious denomination" to produce "proof of his ordination and of his being in regular communion with the religious society").

Finally, Plaintiffs contend that the $500 bond and the "one-time" nature of authorization under § 20-25 are unfairly burdensome. (*See, e.g.*, Compl. ¶ 45.) To the extent that Plaintiffs intend to argue that these requirements support the equal terms claim, neither is sufficient to show injury in fact. The bond requirement may be waived upon a showing of

- 16 -

financial hardship. Va. Code Ann. § 20-25. And it is the prerogative of the Virginia legislature to require that a person who performs a marriage ceremony be certified or licensed. *Cramer*, 202 S.E.2d at 914.

Because Virginia Code §§ 20-23 and -26 do not contain a "discriminatory classification" and Plaintiffs fail to identify a comparator that is similarly situated, the court finds that the ministers have not shown injury in fact as to their Equal Protection claims against the Clerk Defendants.

### b. *Attorney Defendants*

As to the Attorney Defendants, Plaintiffs allege injury flowing from the threat of prosecution under Virginia Code § 20-28. (*See* Compl. ¶¶ 48, 63, 85, 91.) Plaintiffs claim that the Attorneys' "unrenounced obligation to enforce" the statute "singles out the [Church] and its ministers for disfavored treatment," burdens their religious practice, and chills their expressive activity. (*Id.* ¶¶ 78, 85, 91.) Since Plaintiffs do not allege that the Attorneys have prosecuted or have directly threatened to prosecute them under § 20-28, they must meet the threshold showing for injury in fact for a pre-enforcement challenge. To do so, Plaintiffs need not "wait for government enforcement or sanctions," but they still must allege (1) "an intention to do something prohibited by the statute" and (2) a "credible threat of prosecution under [the statute]." *LaFave v. Cnty. of Fairfax*, 149 F.4th 476, 485 (4th Cir. 2025) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014)) (cleaned up). Plaintiffs fail to satisfy either element here.

Plaintiffs do not allege an intention to do something prohibited by § 20-28. While the ministers allege that they are "ready and willing to officiate weddings" consistent with their religious beliefs, (*id.* ¶¶ 52, 65), nowhere in the Complaint do they allege that they intend to

do so without authorization from the state of Virginia. Section 20-28 prohibits solemnizing a wedding without authorization, not holding oneself out as available to officiate weddings or officiating weddings consistent with certain religious beliefs. Plaintiffs do not allege any intention to engage in conduct that is prohibited by the statute.

Even if Plaintiffs alleged an intent to act in violation of the statute, they do not allege a credible threat of prosecution under the statute. Plaintiffs argue that the Attorney Defendants have an "unrenounced obligation to enforce Va. Code Ann. § 20-28 against ULC Monastery ministers who perform marriage rites that are prohibited." (*Id.* ¶¶ 71–72, 78, 85.) But as the Attorneys point out, they have no such obligation. (*See* Attorney Defs.' Br. at 11 (Dkt. 31).) Because § 20-28 is an unclassified misdemeanor, *see* Va. Code Ann. § 18.2-8, Commonwealth Attorneys in Virginia have discretion over whether to prosecute violations of the statute, *see* Va. Code Ann. § 15.2-1627(B).

In light of the Commonwealth Attorneys' discretion to enforce the relevant statute, Plaintiffs must show "more than the fact that state officials stand ready to perform their general duty to enforce laws." *Doe v. Duling*, 782 F.2d 1202, 1206 (4th Cir. 1986) (citing *Poe v. Ullman*, 367 U.S. 497, 501 (1961)). The Attorney Defendants note that they have never prosecuted or threatened to prosecute anyone under § 20-28, and even further, that they are not aware of a single prosecution or threat of prosecution under the statute in their respective jurisdictions. (Attorney Defs.' Br. at 10.) This showing weighs in favor of finding no credible threat of prosecution. *See Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (finding no credible threat of enforcement where state officials had not threatened

prosecution, plaintiffs offered no evidence of the law having been enforced, and plaintiffs failed to allege a "concrete intention" to violate the statute).

Here, Plaintiffs offer no facts that suggest a threat of enforcement from Defendants. Instead, Plaintiffs point to a supposed relaxed standard that the court must use when analyzing the credible threat of prosecution prong in First Amendment cases. (Pls.' Resp. at 9.) In the First Amendment context, a law that "facially restricts expressive activity by the class to which the plaintiff belongs" may present a credible threat of enforcement sufficient to ground an as-applied challenge to the statute in question. *Preston v. Leake*, 660 F.3d 726, 736 (4th Cir. 2011) (cleaned up). This presumption is "particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights." *Id.* Plaintiffs argue that the "existence" of § 20-28 is sufficient to establish standing because the law "undisputedly makes it a crime for Church ministers to solemnize a marriage without state authorization." (Pls.' Resp. at 9.)

Of course, there are occasions "when the chilling effect of a statute is so powerful and the rights it inhibits so important that the mere existence of the statute may warrant judicial intervention." *Duling*, 782 F.2d at 1206. But these cases "must be rare, for otherwise the case or controversy requirement would be set at naught." *Id.* This is not one of those cases. Plaintiffs fail to show how §§ 20-23, -26, or -28 "facially restricts expressive activity by the class to which the plaintiff belongs." *Preston*, 660 F.3d at 736 (cleaned up). As the Attorney Defendants point out, almost anyone of any faith tradition could become licensed to officiate weddings under one of the three statutes; there is no class whose expressive activity is restricted. (*See* Attorney Defs.' Reply at 6.) In other words, because ULC ministers can still receive authorization under § 20-25, the statutes do not "facially restrict" *any* expressive

activity. The mere existence of a statute that penalizes unauthorized solemnization of marriages does not injure an aspiring celebrant, who simply wishes to receive said authorization under one provision and not another.[3] And "[a]bsent threatened injury, such as prosecution, review of criminal laws is, in effect, an appropriation of power by the federal judiciary." *Duling*, 782 F.2d at 1207. Accordingly, even under the standard for First Amendment claims, the court finds Plaintiffs fail to show a credible threat of prosecution.

Lastly, Plaintiffs' allegations of a chilling effect do not save them. Even when a plaintiff alleges a chilling effect, showing credible threat of enforcement is still "critical," because "without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Abbot v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (citations omitted). Since Plaintiffs cannot show a credible threat of enforcement, their allegations of a chilling effect are not enough to establish standing. Indeed, "[e]ven in the area of First Amendment disputes, the Supreme Court has generally required a credible threat of prosecution before a federal court may review a state statute." *Duling*, 782 F.2d at 1206. Accordingly, the court finds the Minister Plaintiffs do not show injury in fact as to their constitutional claims against the Attorney Defendants.

2. <u>Traceability</u>

The Plaintiffs also fail to show that their alleged injuries are traceable to Defendant Falls. The Clerk Defendants argue that the "complaint fails to allege that Clerk Falls took any

---

[3] As discussed above, Reverend Shorts asserts that she was "unwilling to seek secular approval for something she understood to be a spiritual act." (Compl. ¶ 14.) But any authorization from the Commonwealth of Virginia to solemnize a marriage is secular, no matter which subsection the authorization is under.

concrete action that caused [Davis's] alleged injury." (Clerk Defs.' Br. at 8 (Dkt. 29).) "[T]he only factual allegation concerning Clerk Falls," they contend, "is that a deputy clerk in her office informed [Davis] that he would not be permitted to solemnize marriages under Va. Code § 20-23 due to his ULC ordination." (*Id.* at 9.) According to the Clerk Defendants, this "informal conversation with a subordinate official, unaccompanied by any formal application, denial, or written decision, is insufficient to establish standing," since Davis "was never subject to any official action." (*Id.*)

Traceability is established if it is "likely that the injury was caused by the conduct complained of," *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000), or if the conduct "is at least in part responsible" for the alleged injury, *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). But Plaintiffs do not allege any conduct at all by Falls, let alone any conduct that is traceable to their alleged injuries. Plaintiffs complain of conduct by "clerks in that office reporting to Defendant Falls" and by "Defendant Falls's staff," (Compl. ¶ 59), but not of any particular actions taken by Falls herself. And since vicarious liability is not applicable to Section 1983 suits, Plaintiffs must "plead that each Government-official defendant, through [the official's] own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The complaint is devoid of any facts to suggest that Falls's "individual actions" caused Davis's alleged injury. Accordingly, the court finds that Plaintiffs failed to allege traceability of the claims as to Falls.

The Clerk Defendants, however, do not challenge the traceability of the ministers' alleged injuries to Landes's conduct. Plaintiffs allege that Landes personally advised them that they do not qualify for authorization under § 20-23 or § 20-26 and that these denials caused

their alleged injuries. (*See, e.g.,* Compl. ¶¶ 41–44, 59.) Accordingly, the court finds that Plaintiffs sufficiently alleged that their injuries are traceable to Landes's conduct. Plaintiffs still failed, though, to allege injury in fact as to Landes as analyzed above. Because neither Shorts nor Davis can show injury in fact *and* traceability as to any one of the Defendants, the court finds that the individual Plaintiffs do not have standing.[4]

### B. Organizational Standing

ULC has two paths to satisfy Article III's standing requirements. First, it may establish standing on its own behalf by seeking redress for an "injury suffered by the organization itself." *Stroube*, 413 F.3d at 458. Second, it may establish "associational standing" on behalf of its members when: "(1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *Stroube*, 413 F.3d at 458 (quoting *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002)).

Because the Minister Plaintiffs do not have individual standing to sue the Clerk and Attorney Defendants, the Church cannot establish associational standing. The question, then, is whether the Church itself has suffered a cognizable injury that is traceable to Defendants and redressable by a favorable decision. *See Spokeo*, 578 U.S. at 338; *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991) ("When determining whether an association has standing, a court conducts the same inquiry as in the case of an individual . . . .").

---

[4] The court declines to address the redressability prong. *See, e.g., Lane v. Holder*, 703 F.3d 668, 673 n.4 (4th Cir. 2012) ("Because . . . traceability is absent, we do not reach the separate requirement of redressability.").

The Church claims that the Clerks' conduct "relegate[s] the Church to second-class status," "damages [its] reputation," "interfere[es] with its religious mission," and denies the Church "a benefit available to other religious organizations." (*Id.* ¶ 51, 64; Pls.' Resp. at 8.) But the Clerks' advisements have no such effect on the Church. The Church ministers may officiate weddings as they wish in Virginia, just like any other religious ministers, provided they receive the proper authorization. And the Church has not shown or alleged anything to suggest that its ministers would be unable to receive authorization under § 20-25. The Clerk's conduct, then, caused no injury to the Church.

The Church also argues that it has organizational standing because the existence of § 20-28 creates a credible threat of prosecution for its ministers who "officiat[e] a marriage in their religious capacities." (Pls.' Resp. at 12.) The court has already found that the Minister Plaintiffs have not shown a credible threat of prosecution under § 20-28. The Church, then, cannot use the same theory to establish standing. The existence of § 20-28 has no effect on ULC's "ability to associate with" their ministers or its "mission to make its ministry available to those who share its values," since ULC ministers can still officiate weddings in Virginia by receiving proper authorization required under the applicable statutes. (*Id.*) Accordingly, the court finds that the Church does not have standing to bring its claims against Defendants.

\* \* \*

In support of their standing arguments, Plaintiffs reference two cases from other courts that involve suits brought by Universal Life Church. Because those courts found standing for

the Church and its ministers against similar defendants, this court finds it appropriate to briefly

distinguish the case before it here.

In *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022), the

Church and its ministers sued a variety of Tennessee state officials, including district attorneys

and county court clerks, alleging that Tennessee's marriage ordination law was

unconstitutional as applied to Plaintiffs.  In addition to certain state officials, the Tennessee

law allows "regular" ministers whose ordination occurred "by a considered, deliberate, and

responsible act" to officiate marriages. *Id.* at 1025; *see also* Tenn. Code Ann. § 36-3-301.  In

2019, the Tennessee legislature amended the law to explicitly clarify that "[p]ersons receiving

online ordinations may not solemnize the rite." *Id.*  Also in 2019, the legislature increased the

penalty for violating Tennessee's false statements statute—for example, by attesting to a

solemnization on a marriage license despite knowingly lacking the requisite authority—from

a misdemeanor to a felony.  *Id.* at 1028.  The amendments went into effect the same day.  *Id.*

The Sixth Circuit found that the Church and the Minister Plaintiffs had standing to

bring claims against two county district attorneys and one county clerk.  *Nabors*, 35 F.4th at

1034–36, 1039–40.  But *Nabors* is different from the instant case.  Tennessee does not provide

an alternative path for ULC ministers to receive authorization to officiate marriages, as there

is no analogous statute to Virginia Code § 20-25.  ULC ministers in Tennessee, then, are barred

from officiating at all if they do not qualify under the contested statute.  ULC ministers in

Virginia are not so barred, since they can pursue authorization under § 20-25.  Accordingly,

despite the finding of standing against one of the county clerks in *Nabors*, *see id.* at 1039–40,

this court is not persuaded that Plaintiffs here show the same injury.

- 24 -

Next, the Sixth Circuit finds a credible threat of prosecution in *Nabors* in large part due to facts that are not present here. The court found a credible threat of prosecution based on (1) the legislature's specific amendments to ban "online ordinations," (2) the enhancement of the false statements statute, and (3) the fact that they were amended and took effect simultaneously. *Nabors*, 35 F.4th at 1034–35. In Virginia, however, the statutes do not mention "online ordination" and have stood without core substantive amendment for decades. Virginia Code §§ 20-23 and 20-28 originated in 1919, § 20-26 was added in 1968, and § 20-25 was added in 1981. The Virginia legislature's actions do not suggest "real and immediate" threat of prosecution in the same way that the Tennessee legislature's actions did. *See Duling*, 782 F.2d at 1206 ("[O]ne must show a threat of prosecution that is both real and immediate.").

Finally, the *Nabors* court cited the Tennessee Plaintiffs' stated intent to violate the contested statues, which, as discussed above, the Virginia Plaintiffs here have not shown. *See Nabors*, 35 F.4th at 1034. Accordingly, the Sixth Circuit's finding of standing does not persuade this court that Plaintiffs have standing here.

In *Universal Life Church Monastery Storehouse v. McGeever*, No. 2:21-cv-00618, 2022 WL 214238 (W.D. Pa. Jan. 25, 2022), the Church sued county officials in Pennsylvania for refusing to allow Church ministers to solemnize marriages in Allegheny County. The district court found standing for the Church in large part because "Universal's ministers were expressly told that they could not solemnize marriage ceremonies—thereby chilling their First Amendment rights." *Id.* at *4. In this case, however, the Minister Plaintiffs were not told they could not solemnize marriage ceremonies; in fact, they were explicitly encouraged to pursue

authorization to do so under § 20-25.  (*See, e.g.*, Compl. ¶¶ 42, 44, 59.)  Accordingly, the court

finds that *McGeever* is not analogous to the instant case.

### IV.    Conclusion

For the foregoing reasons, the court will grant the Clerk Defendants' motion to dismiss,

(Dkt. 26), and the Attorney Defendants' motion to dismiss, (Dkt. 30), for lack of subject

matter jurisdiction.  The court will, therefore, deny the Attorney Defendants' motion to

dismiss for failure to state a claim, (Dkt. 24), as moot.

An appropriate Order will issue.

**ENTERED** this 11th day of February, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE